## UNITED STATES v. BROTHERHOOD OF RAILROAD TRAINMEN et al.

### No. 50–C–1746.

United States District Court
N. D. Illinois, E. D.

Feb. 9, 1951.

Otto Kerner, Jr., U. S. Atty., and John P. Lulinski, Asst. U. S. Atty., Chicago, Ill., J. Gregory Bruce and Jess H. Rosenberg, Attys, Department of Justice, Washington, D. C., for petitioner, the United States. Newell A. Clapp, Acting Asst. Atty. Gen., and Joseph M. Friedman, Sp. Asst. to the Atty. Gen., of counsel.

Walter N. Murray and Edward B. Henslee, Chicago, Ill., for the respondents.

IGOE, District Judge.

I don't suppose I will ever know any more about this case than I do right now. I might as well say some of the things that I am thinking about.

I think we can start off by referring to the fact that an injunction was issued in this case on the 13th day of December, 1950, and it had three general provisions in its order. One was directed at the Brotherhood of Railroad Trainmen and its lodges and subunits and its officers restraining them from in any manner encouraging, ordering, engaging in or taking any part in the strike.

The second had to do with the members of the Railroad Trainmen, restraining them along the same lines and the third paragraph has to do with what Mr. Lulinski calls an exhortation feature where it was suggested to them in appropriate language that they take whatever action was necessary to have the members of this Union resume their former place of employment.

Now, that was the injunction that was issued. Thereafter rule to show cause was entered calling upon the respondents to that rule to show cause why they should not be punished for failure to comply with the provisions of the injunctive order.

An answer was filed to that rule to show cause and that is the issue which has been on trial in this court for several days.

Much evidence has been heard and many witnesses have been listened to. Out of all of it we are supposed to arrive at some sort of a conclusion which is determinative of this issue.

It is not an easy case to decide. No case where human rights are involved is ever easy to decide. Always the case involving the man who works is most difficult to decide. There are certain things, however, that are not involved in this law suit and, I think, we ought to talk about them first:

First of all, there is no involuntary servitude connected with this law suit because the injunctive order provides nothing shall be construed to require an individual employee to render labor or services without his consent or to make the quitting of his labor or services by an individual employee

an illegal act. In other words, anybody in America can quit any job he wants to and there is no power under our Government that can tell a person to work if such a person does not desire to work. So, we will eliminate that feature from this case.

Now, the wages that the men have received and the hours that they work and the conditions under which they work are not in issue here. They are not in this law suit. And a right-minded person may sympathize with everything for which the men are contending, more wages, better working conditions, happier lives, on all of those things we may sympathize with them; we may sympathize but they are not at issue in this law suit. And so, we will eliminate that.

There is another item that should be eliminated. That is patriotism. There isn't any question about the patriotism of the men involved in this law suit. There is no question about the patriotism of the men involved on either side of the law suit. Among the members of the Brotherhood are, I think it has appeared from the evidence, many of them who have served under the flag of this country in different areas of warfare, and their descendants are perhaps serving at the present time. They exhibit at the present time, as I am sure they always have in the past and no doubt will in the future, they exhibit and they display just as much patriotism as any other group of individuals anywhere within our land. Let us eliminate patriotism.

■ We then get down to this question: what is this law suit about? This law suit is about a difficulty your Government has experienced in trying to function as a Government. That is what is involved here. We are all part of the Government. That flag over there is just as much your flag as it is mine. You are just as much interested in the protecting of it as I am and, perhaps, at times you have done more than I have to protect it. But your Government is involved in this situation, and your Government says its right to function as a Government has been interfered with. That is what is involved here.

It is not wages, it is not hours, it is not working conditions. It is not patriotism. The question involved here is shall this Government function as by its founders it was intended to function. That means shall it be permitted to function by discharging all of its Constitutional duties.

One of its duties has to do with interstate commerce. Under our Constitution the commerce between our states must not be interfered with. It must not be obstructed. That is an obligation of our Government. He who interferes with the exercise of that duty of our Government interferes with the Government.

Another obligation cast upon the United States Government has to do with the mails. It has to do with the establishment of rural roads for the transportation of mail. It has to do with the operation and function of the Post Office. That is something your Government is charged with. Your Government says that obligation on its part has been interfered with because the commerce between the states carrying that mail has been impeded.

We, of course, live at a time when another right of our Government it is claimed has been interfered with. I do not want to dwell much upon that because it always creates a lot of situations that, perhaps, had better not be created, and that is this sickening question of impending war. Of course, everybody realizes our Government has the right to conduct a war, and everybody realizes that in the conduct of a war no one shall interfere with the Government.

Now, I mention those as some of the great rights that this Government has which underlie this law suit, and it is about those rights that your Government is complaining at the present time. They say they are interfered with, and the Union men, perhaps with the best intentions say, "We believe in all those things but we also have the right to live. We also have the right to rear our families. We also have the right to a decent wage and proper working conditions." All of that is granted. All of that should be yours but in seeking those rights you are permitted to go so

far and no further. You are permitted to approach so far and beyond that point you are not permitted to go further. And when it comes to a question of the rights of an individual as compared with the rights of the Government, of course, the rights of the individual are secondary to the rights of the Government. The Government represents all of us.

Now, this is not a new situation. As Mr. Lulinski said a moment ago, this came up in this very City more than half a century ago in the case which involved one of the greatest labor leaders America ever produced, Mr. Eugene Debs. In re Debs, 158 U.S. 564, 15 S.Ct. 900, 912, 39 L.Ed. 1092. That law suit arose in this City. It arose out of a dispute between labor men and railroads. The son of one of the lawyers who represented Mr. Debs appears in this court room at times. The partner of one of the lawyers for Mr. Debs is a retired Judge of this Court. That is how close it is to the present situation.

Now, here is what the Court said in that case, among other things: "We have given to this case the most careful and anxious attention, for we realize that it touches closely questions of supreme importance to the people of this country. * * * while it may be competent for the government (through the executive branch and in the use of the entire executive power of the nation) to forcibly remove all such obstructions, it is"—that is obstructions to interstate commerce—"it is equally within its competency to appeal to the civil court for an inquiry and determination as to the existence and character of any alleged obstructions, and if such are found to exist, or threaten to occur, to invoke the powers of those courts to remove or restrain such obstructions; that the jurisdiction of courts to interfere in such matters by injunction is one recognized from ancient times and by indubitable authority * * * that the complaint filed in this case clearly showed an existing obstruction of artificial highways for the passage of interstate commerce and the transmission of the mail,— an obstruction not only temporarily existing, but threatening to continue; * * *"

and under such circumstances the Court had the power to issue an injunction.

An unjunction was issued in that case and Mr. Debs and his associate violated the injunction and they were brought to court in this City and they were ruled to show cause, and after a full and complete trial punishment was imposed upon Mr. Debs.

The case from which I have just read is the case which the Supreme Court decided at the time that issue was passed upon. So this question of dispute in a matter of this nature wherein the Government is asserting its sovereignty is not something that is new at all. It is as old as the Government itself. In labor litigation it goes back, in this City, for more than a half a century.

Now, having disposed of the proposition that the Government does have the right to come in here and seek an injunction and having also disposed of the different matters which are not in issue here, let us now come down to an inquiry as to what has been produced in evidence here and what is before this Court:

First of all, I think it should be said— as it has been said in two or three of these cases—that as long as a Union is functioning as a Union it must be held responsible for the mass actions of its members. That means this, that when the members go out and act in a concerted fashion and do an illegal act the Union is responsible. They just can't say, "Oh well, we didn't do that as Union members."

If they are members of the Union, then they do act in concerted fashion under the decision of the courts of this country; if it is a mass action the Union is responsible for that sort of an action.

Now, what do we have here? We have here a charge that a strike occurred as a result of a mass action on the part of the members of the Union. What is the defense to that? There isn't any defense. Your officers, all of the way from Mr. Kennedy down, have admitted that an illegal strike occurred. That is a fact. An illegal strike occurred in this community participated in by members of this Union.

Now, the Government says that that could have been avoided and these men

432

could have been put back to work. Your counsel, Mr. Murray, very eloquently argued the officers of the Union did everything possible to have the men return to work. They exhorted with them, they pleaded with them. He said they even carried some of them over to work but still they didn't go to work.

■ Now, can the Union escape responsibility under that sort of a situation? Let us admit Mr. Kennedy did what he says he did, all he says he did, and these officers did all they said they did. Yet, the great mass of the Union stayed out. They said, "We refuse to work. We are sick." And they carried on what it is admitted was an unauthorized work stoppage or unauthorized strike. That is admitted.

Now, who is going to be held responsible for that? Is the responsibility attached to the officers of this Union or is it attached to the Union itself?

Now, from the way the testimony went in here and from the way this Union functions, these officers—I won't say they were afraid to work or to discharge their duties, but I will be very charitable and I will say that they would be very much embarassed if they carried out literally all of the provisions of your constitution and filed charges against these members who participated in this illegal work stoppage. That thing, perhaps, would not work out from a human standpoint at all. They didn't do it, and they didn't do it because of—well, just because they were men and they were working alongside of the other men and they simply were not going to file charges against them.

That meant that the Union, in effect, practically approved everything these fellows were doing and they approved it up until the time that action was taken of a definite nature and the men returned to work.

Now, out of all that picture comes this situation: this illegal strike, this work stoppage, did tie up the railroad industry of America for two or three days in which this illegal activity occurred back in December, 1950. It most flagrantly appeared in Chicago, the railroad center of America,

the most important railroad center in this country. Under the testimony it existed in the larger railroad centers of activity all over this country which to me indicates that the Union, through its members, participated in that illegal activity, and they did act in a mass formation and they did function as a unit, and for that I think they should be held to account.

I think the Union must be held to having violated this injunction both from a civil and from a criminal standpoint.

■ Insofar as Mr. Kennedy and all of his subordinates are concerned, I am going to give them the benefit of the doubt. I think the problems they have faced have been most difficult and I think their attempt to discharge the different obligations imposed upon them have brought to them burdens that, perhaps, they have borne just about as well as human nature could bear.

I look upon this action as a Union action. I look upon this responsibility as a Union responsibility and for the action taken I think the Union should be responsible. I am not going to impose those fines of astronomical figures that the Government suggested. I think however, the Union should be made to realize that they have done America a great wrong. The fine against the Union will be $25,000. The individual respondents will be discharged. The Rule as to them will be discharged.

Findings of Fact and Conclusions
of Law in Proceedings for Civil
and Criminal Contempt.

Upon consideration of the entire record, proceedings and arguments of counsel, the Court makes the following findings of fact and conclusions of law:

Findings of Fact.

1. Respondent, Brotherhood of Railroad Trainmen, is an unincorporated labor organization and represents employees in the railway industry. Duly authorized agents of the said Brotherhood are engaged in representing and acting for employee members of the Brotherhood and for other railroad employees in the City of Chicago,

State of Illinois. The remaining respondents above-named are either (a) subordinate lodges of the Brotherhood, (b) officers of the Brotherhood, or (c) general chairmen or local chairmen of committees representing the Brotherhood.

2. On August 25, 1950 the President of the United States, acting under the Constitution and laws of the United States, including the Act of August 29, 1916, 39 Stat. 619, 645, 10 U.S.C.A. § 1361, issued Executive Order No. 10155. By the terms of said Executive Order the United States, through the Secretary of the Army, took possession and assumed control and operation as of August 27, 1950 of the railroad transportation systems named in the Executive Order, which said systems include most of the major operating railroads and switching and terminal companies of the nation.

3. Upon the assumption as of August 27, 1950 of such possession, control, and operation of the transportation systems by the United States, the United States became the employer of the employees performing services on the seized transportation systems. Such relationship has continued to the present date, and at no time since August 27, 1950 have the seized transportation systems themselves stood in the capacity of employer.

4. Beginning in or about the early morning of December 13, 1950, large numbers of railroad yard service employees, commonly designated as yardmen or switchmen, absented themselves in mass from their normal employment on various transportation systems serving the Chicago area, which said systems were in the possession and control of the United States of America.

5. During the course of the same day, December 13, 1950, the number of such absentees and the number of affected railroad systems rapidly increased, with the result that by the afternoon of that day all but a very few of the railroads serving the Chicago area were forced to discontinue normal operations therein and railroad traffic in and about Chicago was almost completely immobilized.

6. In the evening of December 13, 1950 the United States of America as plaintiff filed a verified complaint and supporting affidavits in this Court alleging, among other things, that the aforesaid mass absenteeisms and work stoppages constituted a strike by the defendant Brotherhood of Railroad Trainmen against the United States of America in its operation of the affected railroad systems. The complaint further alleged that such strike, if permitted to continue, would deprive the nation of essential transportation service, would obstruct the flow of interstate commerce and the transmission of the mails, would interfere with and obstruct the effective performance and discharge of vital and necessary governmental functions, would imperil the national security, health and safety, and would cause the United States to suffer immediate and irreparable injury for which it had no adequate remedy at law. The complaint prayed that a permanent injunction against the strike be issued and that temporary injunctive relief be granted.

7. It appearing to this Court from plaintiff's verified complaint and supporting affidavits that temporary injunctive relief should be granted, a temporary restraining order was issued by this Court on December 13, 1950 at 9:10 p. m. By its terms the order was to expire on December 23, 1950 at 9:10 p. m. unless extended. The order was thereafter extended by orders of this Court, for good cause shown and upon written consent of the parties, and by reason thereof the temporary restraining order issued on December 13, 1950 has continuously remained in full force and effect from its issuance until the present time.

8. The temporary restraining order issued by this Court on December 13, 1950 recited, as follows:

"Now, Therefore, it is by the court this 13th day of December, 1950, Ordered:

"1. That the defendant Brotherhood of Railroad Trainmen, its lodges or other subunits, and their officers, agents, servants and employees and all persons in active concert or participation with them be and they hereby are restrained pending further

434

order of the court from in any manner encouraging, ordering, engaging in or taking any part in a strike in the railroad systems of transportation of the United States, which said systems are in the possession, control and operation of the United States of America under Executive Order Number 10155, or from in any manner interfering with or affecting the orderly continuance of work in the said railroad systems, and from taking any action which would interfere with this court's jurisdiction in the premises.

"2. That the members of the Brotherhood of Railroad Trainmen, acting in concert, be and they hereby are restrained pending further order of the court from (a) in any manner encouraging, ordering, engaging in, or taking any part in a strike in the railroad systems of transportation of the United States, which said systems are in the possession, control and operation of the United States of America under Executive Order Number 10155, (b) in any manner interfering with or affecting the orderly continuance of work in the said railroad systems, and (c) taking any action which would interfere with this court's jurisdiction in the premises; and the said members acting in concert be and they hereby are directed to continue or resume their normal employment under Executive Order Number 10155; Provided, however, that nothing in this paragraph shall be construed to require an individual employee to render labor or service without his consent or to make the quitting of his labor or service by an individual employee an illegal act.

"3. That the Brotherhood of Railroad Trainmen, its lodges or other sub-units and their appropriate officers, agents, servants and employees be and they hereby are directed forthwith to instruct—and to take all action as may be necessary to insure that such instructions are carried out—all their members to continue or resume their normal employment under Executive Order Number 10155."

9. Verified copies of the said restraining order were served late in the evening of December 13, 1950, upon the respondent, Brotherhood of Railroad Trainmen, by personal delivery to its authorized officers and agents. Copies of the said restraining order were subsequently also served upon the other respondents above-named, as appears from the returns by the United States Marshal filed in this Court. In addition, the fact of the issuance by this Court of the temporary restraining order and the substance and contents of the order received immediate, widespread and prominent publicity on the radio and in the newspapers of the nation which were circulated in the morning of December 14, 1950.

10. Subsequent to the issuance and service of the temporary restraining order as aforesaid, the work stoppages by railroad yardmen continued to spread on December 13, 14, and 15, 1950 to numerous other places in all sections of the United States— North, South, East and West—including centers of such strategic importance to the railroad transportation requirements of the nation as St. Louis, Missouri, and Washington, D. C.

11. On December 15, 1950 the United States of America filed a petition in this Court for a rule to show cause why the respondent, Brotherhood of Railroad Trainmen, and the other respondents above-named should not be adjudged guilty of civil and criminal contempt for violation of the temporary restraining order issued by this Court on December 13, 1950. A rule to show cause was issued by this Court on December 15, 1950, which rule set the return date thereon for December 18, 1950 at 2:00 p. m. and the date for a trial thereon for December 21, 1950, 2:00 p. m., or for such other day as should be determined by the Court. Certified copies of the rule to show cause, together with the petition by the United States and supporting exhibits, were duly served on the respondents above-named, as appears from the returns by the United States Marshal on file in this Court.

12. On the return day, December 18, 1950, the Brotherhood of Railroad Trainmen and the other respondents above-named, appeared in court, personally and through their attorneys, which attorneys on December 18, 1950 filed a single answer on behalf of the Brotherhood and all the

other respondents above-named praying that the rule to show cause why they should not be held in civil and criminal contempt of the court be dismissed and all the respondents (sometimes designated as defendants) be discharged.

13. Thereafter, upon consent of the parties and for good cause shown, the trial on the rule to show cause in the contempt proceedings was continued from time to time until February 2, 1951. Prior to the introduction of evidence in the contempt proceedings the respondents objected to the jurisdiction of this Court to entertain the suit by the United States for an injunction and to issue the temporary restraining order.

14. A full and complete trial of the civil and criminal contempt charges began on February 2, 1951 and extended over February 2, 3, 5, 6, 7, 8, and 9, 1951, at which trial the parties were given full opportunity to introduce evidence, to cross-examine witnesses, to present argument, and to avail themselves of any and all rights to which they might be entitled.

15. (a) By order entered on February 8, 1951, on the consent of the United States of America, the following named respondents were dismissed from the rule to show cause in the contempt proceedings: Dining Car Lodge No. 1942 (BRT); Middle West Lodge No. 877 (BRT); Passenger Lodge No. 931 (BRT); T. J. Potter Lodge No. 6 (BRT); Revised Hope Lodge No. 788 (BRT); E. B. Carr Lodge No. 115 (BRT); "K–K–K" Lodge No. 700 (BRT); Tri-City Lodge No. 617 (BRT); F. S. Atkins Lodge No. 91 (BRT); B. W. Fern Lodge No. 826 (BRT); Third Rail Lodge No. 756 (BRT); F. P. Dermody, Local Chairman (BRT); R. J. Moore, Local Chairman (BRT).

(b) By order entered on February 14, 1951, on the consent of the United States of America, the following named respondents were dismissed from the rule to show cause in the contempt proceedings: Columbia Lodge, No. 479 (BRT); C. M. Cassell, Local Chairman (BRT).

16. (a). There are approximately 90,-000 railroad yardmen in the United States. Of this number, approximately 85,000 are members of the Brotherhood of Railroad Trainmen.

(b) There are approximately 5,000 railroad yardmen in the Chicago, Illinois, area. Of this number, approximately 80% to 90% are members of the Brotherhood of Railroad Trainmen.

(c) The railroad yardmen on all but a very few of the major operating railroads in the United States are exclusively represented for collective bargaining purposes by the Brotherhood of Railroad Trainmen. The railroads on which the yardmen are so represented by the Brotherhood of Railroad Trainmen own in excess of 90% of the total railroad track mileage of the United States.

(d) 28 major railroad transportation systems directly serve and have terminals in the Chicago, Illinois, area. The yardmen on all but two of those railroads are exclusively represented for collective bargaining purposes by the Brotherhood of Railroad Trainmen. The two exceptions are the Chicago, Rock Island and Pacific Railway Company and the Chicago Great Western Railroad Company.

(e) The only major railroad transportation systems directly serving the Chicago area on which there were no work stoppages by yardmen during the period December 13 through December 15, 1950 were the Chicago, Rock Island and Pacific Railway Company and the Chicago Great Western Railroad Company.

(f) Of the yardmen in the Chicago area who absented themselves from their normal employment during the period December 13 through December 15, 1950, at least a substantial majority were members of the Brotherhood of Railroad Trainmen.

17. The work stoppages by yardmen in the Chicago area and in the other places throughout the nation above described, which occurred during the period December 13 through December 15, 1950, could not have occurred in the absence of a concerted plan or concerted mass action by the members of the Brotherhood of Railroad Trainmen.

18. Of the yardmen who engaged in the work stoppages in the Chicago area or in

the other places of the nation during the period December 13 through December 15, 1950, abnormally large numbers reported themselves as being sick.

19. Both prior and subsequent to the issuance of the temporary restraining order by this Court on December 13, 1950, 9:10 p. m., the chief officers of the Brotherhood of Railroad Trainmen characterized the work stoppages as being "strikes", but which strikes were unauthorized in the sense that they had not been called and ratified in accordance with the procedures established by the constitution of the Brotherhood. The evidence establishes, beyond a reasonable doubt, that the work stoppages above described were in fact strikes by the members of the Brotherhood of Railroad Trainmen, acting in concert.

20. The simultaneous alleged sickness by thousands of yardmen during the period December 13 through December 15, 1950 was a sham and a pretense to cover up concerted action by the members of the Brotherhood of Railroad Trainmen in walking out of their jobs and remaining away from such jobs during December 13 through December 15, 1950.

21. The cause of the mass walkout and strike by the members of the Brotherhood of Railroad Trainmen, beginning December 13, 1950, was their dissatisfaction over the delays attending the arrival between the Brotherhood and the railroads at a settlement of disputes respecting wages, hours, and conditions of employment. The disputes had remained unresolved for at least 20 months prior to December 13, 1950, and the dissatisfaction on the part of the members of the Brotherhood had been gradually growing more intense, beginning in the early part of 1950. The purpose of the walkout and strike was to publicize and dramatize such dissatisfaction and thereby to aid the representatives of the Brotherhood in obtaining a speedy and satisfactory settlement of the Brotherhood's disputes with the railroads.

22. During the evening of December 15, 1950 reports were received from Washington, D. C., at which place the president of the Brotherhood was engaged in negotia-tions for the settlement of the Brotherhood's labor disputes with the railroads, that such a settlement appeared to be imminent. Those reports were immediately given widespread publicity through the medium of a press release issued at the White House, and other officials of the Brotherhood were directly informed thereof by the president of the Brotherhood by telegram or telephone.

23. Within a few hours after the receipt of such reports from Washington, D. C., and beginning in or about the early morning hours of December 16, 1950, the striking yardmen commenced to return to their jobs on the railroad transportation systems in the possession, control, and operation of the United States. Within another few hours, as the result of the said return-to-work movement, the work stoppages and strike by the yardmen were discontinued in the Chicago area and, with only a few minor exceptions, were discontinued by December 17, 1950 in the other places in the nation where such work stoppages and strike had occurred.

24. During the period December 13 through December 15, 1950 the chief officers of the Brotherhood and some of its lesser officials, such as general chairmen and local chairmen, condemned the existing strikes as being unauthorized in the sense that they had not been called or ratified in accordance with the procedures established by the constitution of the Brotherhood. They also requested their respective subordinates to try to persuade the striking yardmen to return to their jobs. In the case of the chief officers of the Brotherhood, such requests were usually in the form of telegrams to subordinates. In the case of the respondents vice-presidents of the Brotherhood and some general chairmen, the requests were in the form of telegrams and personal conversations. There was also a meeting in the afternoon of December 14, 1950 in Chicago, presided over by two vice-presidents of the Brotherhood and attended by approximately 95 local chairmen in the Chicago area as well as other officials of the Brotherhood or its subordinate lodges, and at which meeting there were read, to the assemblage, mes-

sages by the president of the Brotherhood and the text of the temporary restraining order issued by this Court on December 13, 1950. In the case of local chairmen of the Brotherhood, each attempted to contact personally or by telephone some of the striking members and made some efforts to persuade them to return to work.

25. At no time from December 13, 1950 until the present have any of the respondents herein, including the Brotherhood of Railroad Trainmen, its chief officers, its subordinate lodges, or the officers or members of such subordinate lodges, commenced against those who violated the Brotherhood's constitution, as provided by such constitution, any disciplinary or punitive proceedings because of the participation by the lodges or members in the strikes which occurred during the period December 13 through December 15, 1950.

26. The discontinuance of the strike on or about December 16, 1950 by the Brotherhood of Railroad Trainmen was not prompted by a desire to comply with and obey the temporary restraining order issued by this Court but was rather in response to its belief that the concerted action and strike which began on or about December 13, 1950 had accomplished the desired result of bringing the railroads to the point of agreeing to a settlement, satisfactory to the Brotherhood, of the Brotherhood's labor disputes with such railroads.

Conclusions of Law

1. (a) This Court has jurisdiction of the parties to and the subject matter of the suit by the United States of America, for an injunction, and had jurisdiction to issue the temporary restraining order of December 13, 1950.

(b) Irrespective of the ultimate determination of the jurisdictional issue in the main suit, the considerations suggesting that this Court had jurisdiction to entertain the suit by the United States for an injunction and to issue the temporary restraining order were neither so frivolous or insubstantial as to confer upon the parties bound by the temporary restraining order license to disobey the same so long as the order remained outstanding.

2. It is established, by clear and convincing evidence and beyond a reasonable doubt, that the respondent, Brotherhood of Railroad Trainmen, subsequent to the receipt of notice of the temporary restraining order issued by this Court on December 13, 1950 and through December 15, 1950, wilfully and deliberately disobeyed and violated paragraphs 1 and 3 of the said temporary restraining order, as quoted in paragraph 8 of the findings of fact herein.

3. It is established, by clear and convincing evidence and beyond a reasonable doubt, that the members of the Brotherhood of Railroad Trainmen, acting in concert, subsequent to the receipt of notice of the temporary restraining order issued by this Court on December 13, 1950 and through December 15, 1950, wilfully and deliberately disobeyed and violated paragraph 2 of the said temporary restraining order, as quoted in paragraph 8 of the findings of fact herein, and the respondent, Brotherhood of Railroad Trainmen, is legally accountable and responsible for the concerted mass action of its members.

4. The respondent, Brotherhood of Railroad Trainmen, is guilty of civil and criminal contempt of the temporary restraining order issued by this Court on December 13, 1950, by reason of its acts and failure to act subsequent to the receipt of notice of the said order and through December 15, 1950.

5. It is not established beyond a reasonable doubt or by clear and convincing evidence that any of the remaining respondents, other than the Brotherhood of Railroad Trainmen, wilfully and deliberately disobeyed and violated the temporary restraining order issued by this Court on December 13, 1950, by reason of their acts and failure to act subsequent to the receipt of notice of the said order and through December 15, 1950.

6. The remaining respondents, other than the Brotherhood of Railroad Trainmen, are not guilty of civil or criminal contempt of the temporary restraining order issued by this Court on December 13, 1950, by reason of their acts and failure to act subsequent to the receipt of notice of the said order and through December 15, 1950.