SINCLAIR OIL CORPORATION, Plaintiff-Appellant and Cross-Appellee,

v.

OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, et al., Defendants-Appellees and Cross-Appellants.

Nos. 18267, 18268.

United States Court of Appeals, Seventh Circuit.

Oct. 6, 1971.

George B. Christensen, Fred H. Daugherty, John Malugen, Chicago, Ill., for plaintiff-appellant and cross-appellee; Winston, Strawn, Smith & Patterson, Chicago, Ill., of counsel.

Barbara J. Hillman, Chicago, Ill., John R. Tadlock, Denver, Colo., Kleiman, Cornfield & Feldman, Chicago, Ill., for defendants-appellees and cross-appellants.

Before KILEY, STEVENS and SPRECHER, Circuit Judges.

KILEY, Circuit Judge.

Sinclair's appeal presents the issue whether union members bound by a no-strike clause are liable individually, under Section 301 of the Taft-Hartley Act, 29 U.S.C. § 185, for damages resulting from their refusal, in defiance of express directions of the union, to cross a picket line maintained by members of the same union who are in a different bargaining unit. The issue is of first impression. We hold that the individual members are not liable.

Defendants' motion to dimiss admits relevant well-pleaded facts: The International Union [1] and Sinclair in January, 1969, were negotiating a new contract for both the production and maintenance employee unit and the clerical employee unit at Sinclair's East Chicago, Indiana plant. Employees in both units were members of the defendant International Union and Local 7–210 (Union). Pending agreement, all employees in both units struck the plant. An agreement was eventually reached as to the production and maintenance unit, but not as to the clerical unit. The agreement reached contained a no-strike clause. The clerks

---

1. Oil, Chemical and Atomic Workers International AFL–CIO.

remained on strike and picketed the plant. The production and maintenance employees refused to cross the picket line. This suit followed.

The complaint is in three counts. Count 1, brought under Section 301, charges the Union with violation of the no-strike clause and seeks damages for causing the work stoppage. That count is not before us on appeal. Count 2, also under Section 301, is against six named individual members of the Union and seeks damages also for breach of the no-strike clause. Count 3, a state law diversity action, seeks damages for the same alleged breach against the six individuals named in count 2.

On defendants' motion the district court dismissed count 2 as stating no claim on which relief could be granted. Sinclair has appealed from the judgment of dismissal. The court denied defendants' motion with respect to counts 1 and 3. Defendants have appealed—with leave given by us under 28 U.S.C. § 1292 (b) [2]—only from the denial of their motion to dismiss count 3.

### SINCLAIR'S APPEAL

The substance of Sinclair's complaint is an assertion of Union liability because the Union authorized the work stoppage resulting from its members refusing to cross the picket line (count 1), and the alternative assertion of individual liability on the part of the members because of their refusal to cross the picket line "despite, and contrary to, the express instructions" of the Union (counts 2 and 3). The complaint is framed, so far as counts 2 and 3 are concerned, to cover the question expressly reserved by the Supreme Court in Atkinson v. Sinclair

Refining Co., 370 U.S. 238, 249, n. 7, 82 S.Ct. 1318, 1325, 8 L.Ed.2d 462 [3] (1962).

■ The complaint indicates the difficulty which faced Sinclair and the Union where the Union represents two separate units, one of which had agreed on a contract with Sinclair, the other of which was still on strike. Sinclair is deprived of the work force settled in the bargaining agreement as well as being plagued with the clerks picket line while negotiating for an agreement to obtain their employment. The Union, having made an agreement covering the production and maintenance unit, is bound to comply with the no-strike clause and to direct, encourage and order members of that unit also to comply. But compliance requires Union members to cross the picket line of the clerks unit. This is not only anathema to union members generally, but is especially so here where the picket line is maintained by fellow members.

Yet the Union must support the picketing clerks. The result is that it has authorized the strike by the clerks, which has induced a wildcat strike of the production and maintenance men. This tangle confronted Sinclair in seeking an appropriate legal remedy to correct what it considered a grave injustice. If dismissal of count 2 were sustained, Sinclair would be put to proving, in order to recover on count 1, that the Union officials ordered the production and maintenance employees to cross the picket line.

■ Union members are bound by a no-strike clause, Sinclair Refining Co. v. Atkinson, 290 F.2d 312, 317 (7th Cir. 1961). *See* Republic Steel Corp. v. Maddox, 379 U.S. 650, 658–659, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); Vaca v. Sipes, 386 U.S. 171, 184, 87 S.Ct. 903, 17

2. We ordered that the appeals be briefed and argued together as if they were cross-appeals.

3. "In reaching this conclusion [that Count II must be dismissed because it alleges union liability for breach of a no-strike clause but prays for damages from the union agents], we have not ignored the argument that Count II was drafted in order to anticipate the possible union defense under Count I that the work stoppage was unauthorized by the union and was a wildcat strike led by the 24 individual defendants acting not on behalf of the union but in their personal and nonunion capacity. The language of Count II contradicts the argument, however, and we therefore do not reach the question of whether the count would state a proper § 301(a) claim if it charged unauthorized, individual action."

L.Ed.2d 842 (1967); Atkinson v. Sinclair Refining Co., 370 U.S. 238, 246, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962). And employees have been held to have standing to sue an employer under Section 301 for breach of the collective bargaining agreement. Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed. 2d 246 (1962). Individual employees, however, are not liable in damages for breach of a no-strike clause if the union is liable. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed. 2d 462 (1962). In NLRB v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953), the Court decided that absent a provision in the collective bargaining agreement that no member should be required to cross a picket line, the refusal of an employee to cross the picket line of another union amounts to breach of the no-strike clause justifying discharge. However, it is conceded by Sinclair that no case has decided that a union member may be liable under Section 301 for damages for refusing to cross a picket line in violation of a no-strike clause.[4]

Sinclair argues that the language and legislative history of Section 301 clearly evidence a Congressional intention to provide a damage remedy for individual unauthorized breaches of a no-strike clause. We reject the argument as invalid.

It is true that the language of Section 301 does not expressly prohibit employer damage suits against employee union members who engage in a wildcat strike.

But Section 301 does not expressly authorize suits between an employee union member and his employer arising from bargaining contracts. And Section 301 (b) prohibits enforcement against employees or their assets of employer judgments against unions. We do not see how, in view of subparagraph (b) and the "Danbury Hatters" notion discussed hereinafter, an implication can reasonably arise from the terms of Section 301 that Sinclair may recover damage against the individual defendants.

The legislative history of Section 301 does not disclose a Congressional purpose to authorize, in Section 301, an employer's suit against employee union members arising from a wildcat strike in violation of the bargaining agreement. The implied authorization urged by Sinclair cannot be reconciled with the intention of Congress shown in the debates in both Houses during consideration of the proposed Section 301. The legislative history of the Act indicates that the principal concern of Congress was with making unions, as parties to collective bargaining agreements, responsible for breaches of agreements and to avoid subjecting individual union members to fiscal ruin that was visited upon members as a result of the "Danbury Hatters" decision.[5]

A pertinent Senate Committee Report, which appears in the majority and dissenting opinions in Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 454, 531–532, 77 S.Ct. 912, 1 L.Ed.2d 972

---

4. Several decisions have been cited by defendants to support their statement that "every case since *Atkinson* [Atkinson v. Sinclair Refining Co., 370 U.S. 238 [82 S.Ct. 1318, 8 L.Ed.2d 462] (1962)] wherein an attempt was made to hold individual union members personally liable under Section 301 has been dismissed." *See, e. g.*, Williams v. Pacific Maritime Association, 421 F.2d 1287 (9th Cir. 1970); Hall v. Pacific Maritime Association, 281 F.Supp. 54 (N.D.Cal., 1968); Navajo Freight Lines, Inc. v. International Brotherhood of Teamsters, etc., 291 F.Supp. 908 (D.Colo.1968); Gilmour v. Wood, Wire and Metal Lathers International Union, Local No. 74, 223 F. Supp. 236 (N.D.Ill.1963). However, in all these cases the union arguably was liable.

5. 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488 (1908) (sub nom Loewe v. Lawlor). The company recovered damages against individual union members and because execution of judgment could not be had on union assets, levies were made on individual members' homes and taken in satisfaction. Senator Taft stated, "We do not want to perpetuate such a condition." 92 Cong.Rec. 5705 (1946).

(1957), expresses this dual purpose as follows:

> If unions can break agreements with relative impunity, then such agreements do not tend to stabilize industrial relations. The execution of an agreement does not by itself promote industrial peace. The chief advantage which an employer can reasonably expect from a collective labor agreement is assurance of uninterrupted operation during the term of the agreement. Without some effective method of assuring freedom from economic warfare for the term of the agreement, there is little reason why an employer would desire to sign such a contract.
>
> Consequently, to encourage the making of agreements and to promote industrial peace through faithful performance by the parties, collective agreements affecting interstate commerce should be enforceable in the Federal courts. Our amendment would provide for suits *by unions as legal entities and against unions as legal entities in the Federal courts in disputes affecting commerce.*
>
> The amendment specifically provides that only the assets of the union can be attached to satisfy a money judgment against it; the property of the individual members of the organization would not be subject to any liability under such a judgment. Thus the members of the union would secure all the advantages of limited liability without incorporation of the union. (Emphasis added.)

S.Rep.No.105, 80th Cong., 1st Sess., p. 16.

To the same effect is the House report on the Bill [6] and the report of the Joint Conference.[7]

In Senate debate on Section 301 Senator Taft made the following statement upon which Sinclair relies: "If there is a collective bargaining agreement and the men are bound by it, they ought to carry it out. If the union wants to carry it out, and some of the men say, 'We will not do it,' they ought to be liable." 92 Cong.Rec. 5706 (1946). However, in context the statement clearly refers to liability for a fine upon wildcat strikers by the union, a subject mentioned by Senator Capehart just before the Taft statement.[8] Furthermore, in discussing a proposed "subsection (d)," [9] Senator Taft said the wildcat strikers ought to be *disciplined* "if they prevent a responsible labor leader" from performing his agreement and that the proposed provision would permit such leaders to "avoid wildcat strikers." 92 Cong.Rec. 5706–07 (1946). This history rejects Sinclair's theory that count 2 is implicitly justified by Section 301.

We agree with Sinclair that the legislative history and Congressional debates show a concern for the promotion of industrial peace through making unions liable for breaches of their bargaining agreements and to encourage bargaining of no-strike clauses in the agree-

6. H.R.Rep.No.245, 80th Cong., 1st Sess., states, at page 6, that the new provision "makes labor organizations equally responsible with employers for contract violations and provides for suit by either against the other in the United States district court."

7. U.S.Code Cong.Serv.1947, p. 1172.

8. Mr. CAPEHART. I believe I am correct in the statement that in many miners' contracts an agreement is contained that if any member of the union pulls a wild-cat strike, or a sit-down strike, or refuses to work, he is automatically fined by the union, and I think the fine has been as high as $6 a day. I think it will be found today that such provisions are contained in miners' contracts, by which they try to discipline their own members by fining them $2, or $4, or $6 a day if they refuse to work according to the terms of the collective-bargaining contract. 92 Cong.Rec. 5706 (1946).

9. This proposal was not included in the Bill as enacted. It provided that an employee participating in a wildcat strike in violation of a collective bargaining agreement "shall lose his status as an employee."

ments. But we do not agree that Congress thought a no-strike clause would be valueless unless the employer were authorized to recover damages against individual union members engaging in wildcat strikes. On the contrary, Congress, in the debates over Section 301, explicitly considered the problem of wildcat strikes and possible remedies. The remedies suggested were discharge and discipline. There is no indication that Congress considered Section 301 itself a remedy for an aggrieved employer. We think for us to do so would constitute an unwarranted expansion of that Section.

Moreover, Congress did consider the consequences of imposing financial responsibility on union members who engaged in non-tortious unprotected concerted activity as union members, in breach of a no-strike clause, and rejected it. We think the implication is that such employees are not liable—under Section 301—for such a breach even if the union did not authorize the strike.

Neither Congress nor the Supreme Court has been persuaded by the argument, advanced here by Sinclair, that employers' recovery of damages against wildcat strikers would serve the national labor policy of encouraging peaceful settlements of labor disputes. As pointed out by Justice Brennan in deciding that injunctive relief will lie against a union for breach of a no-strike clause, an award of damages is not an effective remedy for an employer faced with an illegal strike and "would only tend to aggravate industrial strife and delay an early resolution of the difficulties between employer and union." Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 248, 90 S.Ct. 1583, 1591, 26 L.Ed.2d 199 (1970).

Congress was well aware of the problems involved in reaching and enforcing no-strike agreements, and we think that when Section 301 was enacted it had no intention of subjecting union members engaged in wildcat strikes to individual liability for damages. We conclude that the primary remedy [10] of Sinclair is discharge or discipline of individual defendants. See NLRB v. Rockaway News Supply Co., 345 U.S. 71, 80, 73 S.Ct. 519, 97 L.Ed. 832 (1953); Atkinson v. Sinclair Refining Co., supra, 370 U.S. at 246, 82 S.Ct. 1318. Of course the Union has the right to discipline its disobedient members. We conclude that count 2 does not state a claim upon which relief can be granted. The district court did not err in dimissing count 2.

## DEFENDANTS' CROSS-APPEAL

 The district court denies defendants' motion to dismiss Sinclair's diversity breach of contract action in count 3 of its complaint. On appeal defendants claim error and assert that since individual liability for concerted action of defendants in violation of their contract is precluded under Section 301, a state cannot impose that liability.

Sinclair seems uneasy in attempting to sustain count 3. On the one hand it "believes" that "ultimately" Section 301 will preclude local law in all actions arising from collective bargaining contracts. On the other hand it clings to the "theoretical possibility" that the Supreme Court may decide that Section 301 does does not preclude state action against individuals guilty of the alleged misconduct stated in count 3 (as stated also in count 2). In that event it says count 3 would remain a "viable alternative" to enforcement against individual union members of their individual contract obligation not to strike.

10. We do not decide today whether an employer may, under Section 301, obtain an injunction against individual wildcat strikers when the strike violates a no-strike clause, see Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), or under what circumstances the union is responsible for its members acting contrary to union orders. Compare United States v. Railroad Trainmen, 27 L.R.R.M. 2308, 2310–11 (N.D.Ill.1951), with Lewis v. Benedict Coal Corp., 259 F.2d 346, 352 (6th Cir. 1958), and United Construction Workers v. Haislip Baking Co., 223 F.2d 872, 877 (4th Cir. 1955).

We think that federal preemption doctrine has withdrawn the diversity remedy stated in count 3. *See* San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); Amalgamated Ass'n of Street, Electric Railway and Motor Coach Employees v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971).

It is well settled that Section 301 does not grant federal courts exclusive jurisdiction over controversies within the statute's purview and thereby deprive a party to a labor contract of the right to redress for its violation in an appropriate state tribunal. Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962). However, a state court—or a federal diversity court —is not free to apply individualized local rules when called upon to resolve union-employer disputes. Section 301(a) "is peculiarly one that calls for uniform law" and "incompatible doctrines of local law must give way to principles of federal labor law." Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers v. Lucas Flour Co., 369 U.S. 95, 102–103, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). "An action arising under § 301 is controlled by federal substantive law even though it is brought in a state court." Avco Corp. v. Aero Lodge No. 735, etc., 390 U.S. 557, 560, 88 S.Ct. 1235, 1237, 20 L.Ed.2d 126 (1968).

We think that both counts 2 and 3 per se, indicate the grave danger that would follow permitting state law to govern actions arising from collective bargaining contracts. The same facts are alleged in each count. We have decided that Section 301, in the light of federal labor policy, legislative history and Congressional intention, was enacted in part to prevent the assessment of damages against individual union members for the alleged misconduct stated in count 2. A state court's grant of such an award would conflict with this policy and therefore must give way to the federal principle. Local 174 Teamsters, etc., v. Lucas Flour Co., *supra*. Congress was concerned to have uniformity in 301 decisions.[11] The additional remedy in state court sought by Sinclair would contravene this policy of uniformity.

True, federal law has not preempted state law with respect to awarding compensation damages to an employee in a tort action against a union based on violence. International Union, United Automobile, etc. Workers v. Russell, 356 U. S. 634, 646, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958). But the Court there decided there was no conflict in the Labor Board's finding a back pay award unnecessary to effectuate the purposes of the National Labor Relations Act, and a state award of damages, including loss of wages. *Id.* at 645, 78 S.Ct. 932. But the conflict is obvious in the case before us where on the same facts count 2 could not be upheld under federal law and count 3 could be upheld under state law. In view of this conflict the incompatible doctrines of state law must give way to principles of federal labor law. Local 20, Teamsters, etc. v. Morton, *supra*, 377 U.S. at 258, 84 S.Ct. 1253.

We hold that the district court erred in denying defendants' motion to dismiss count 3.

The judgment is affirmed to the extent that it dismissed count 2 of Sinclair's complaint; the judgment is reversed so far as it sustained count 3; and the cause is remanded with directions for the sole purpose of dismissing count 3.

11. See Note, 46 Notre Dame Lawyer 529 (1971).