JESSOP STEEL COMPANY, Plaintiff,

v.

UNITED STEELWORKERS OF AMERICA et al., Defendants.

Civ. A. No. 76–872.

United States District Court,
W. D. Pennsylvania.

March 11, 1977.

Thomas Hough, Pittsburgh, Pa., for United Steelworkers of America.

Samuel S. Pangburn, Washington, Pa., for Local Union No. 1141 and individuals, et al.

## OPINION

MARSH, District Judge.

The plaintiff employer, Jessop Steel (Jessop) brought an action on June 3, 1976 against United Steelworkers of America (USW), Local Union No. 1141 (Local) and 13 individual employees of the Electric Furnace Department of Jessop in the Common Pleas Court of Washington County, Pennsylvania. The defendants removed the case to this court pursuant to 28 U.S.C. § 1441(b), asserting that this court would have had original jurisdiction pursuant to 29 U.S.C. § 185.

The plaintiff Jessop seeks injunctive relief and damages.

The trial on the merits was consolidated with a hearing on Jessop's motion for preliminary injunction on August 18 and 19, 1976. The defendants' motion to dismiss the action was denied. The defendants' motion to bifurcate the trial by postponing the damage portion until after the liability issues were decided was granted. Following a supplemental hearing on January 18, 1977, where the parties agreed to certain facts, the court denied Jessop's motion for a preliminary injunction.* It is the opinion of the court that a permanent injunction should be denied and judgment entered in favor of the defendants on the issue of damages.

On August 1, 1974, Jessop entered into an Agreement (Plaintiff's Ex. 1) with the defendants wherein USW represented itself as the sole bargaining agent for the Local employees of Jessop including the 13 individual defendants employed in the Electric Furnace Department of Jessop's plant at Washington County, Pennsylvania. The Agreement expires October 1, 1977.

Jessop employs about 900 employees in its plant and about 78 to 100 of these work in the Electric Furnace Department. All of them pay dues to USW.

Plaintiff manufactures steel in its Washington plant. The steel is manufactured by means of three electric furnaces, which melt scrap metal. After the scrap metal has been melted by the electric furnaces, the molten metal is placed in an argon-oxygen vessel for further refining. The material from the argon vessel is poured into ingots and sent to other departments for further processing.

For some period of time prior to September 1, 1975, employees performing direct production work in the Electric Furnace Department were provided with an incentive plan, which provided them earnings in excess of the standard hourly rate set forth in Appendix A of the labor agreement. These additional earnings accrued to employees for production of steel at a rate in excess of that expected from the standard hourly rate. See Appendix A–1.

During the year 1975, Jessop modified the existing electric furnaces at the Washington plant so as to permit more steel to be melted therein. Plaintiff also purchased new cranes and ladles for its electric furnaces. The modifications were completed on or about August 31, 1975.

The modifications in the electric furnaces increased the capacity of each electric furnace from approximately 29,000 to 30,000 pounds per heat to approximately 37,000 to 40,000 pounds per heat.

Plaintiff then implemented the provisions of Section 9–H of the Agreement which permits a change in incentive plans upon the introduction of new equipment. The old incentive plan was cancelled on August 31, 1975. Pending institution of a new incentive plan, the employees were paid an interim rate specified in the Agreement at Section 9–H–1–d. On October 13, 1975, a new incentive plan was put into effect, but the new plan did not meet the approval of the Local including the 13 individual de-

* See order filed January 20, 1977.

fendants who are the highest paid employees in the Electric Furnace Department. The employees engaged in a slowdown of production in the Electric Furnace Department in protest of the new incentive plan. The slowdown caused pecuniary damages to Jessop and loss of wages to the employees. The incentive level of production declined precipitously, but the standard hourly rate of production was substantially maintained. From October 13, 1975 to June 6, 1976, the operating performance in the Electric Furnace Department was 92.6%.[1] (Transcript of August 18–19, 1976; pp. 59–60).

On January 9, 1976, the Local filed a grievance (Plaintiff's Ex. 2) asking for revisions in the new incentive plan retroactive to the day of installation, i. e., October 13, 1975. The parties were unable to resolve the grievance and, on May 18, 1976, an arbitrator found that the new incentive plan maintained "the integrity of the previous incentive plan under Section 9–H of the Agreement," and therefore denied the grievance. (Plaintiff's Ex. 3).

The liability portion of the bifurcated trial ended August 19, 1976. The next day, August 20, 1976, a revised incentive plan was agreed to and adopted by Jessop, USW and the Local effective August 23, 1976, and that plan is currently in effect. (Transcript of January 18, 1977, p. 4).

The slowdown ended about August 29, 1976. (Id., p. 2). All grievances relating to Jessop's actions in disciplining certain employees for taking part in a slowdown were withdrawn by the union as part of the understanding reached by Jessop, USW, the Local and the individual defendants on August 20, 1977. (Id., pp. 2–4. See also, Transcript of August 18–19, 1976, pp. 48–49, 91).

The collective bargaining agreement does not contain an express no-strike clause.

Nothing is said about a strike or a slowdown. However, in a preamble entitled Section 1—PURPOSE AND INTENT OF THE PARTIES, the following is stated:

"The purpose of the Company and the Union in entering into this Labor Agreement is to set forth their agreement on rates of pay, hours of work and other conditions of employment so as to promote orderly and peaceful relations with the employees and to achieve uninterrupted operations in the plant." (Agreement, p. 5) (Plaintiff's Ex. 1).

The Agreement sets forth in detail a grievance procedure *"limited to a complaint of an employee"*[2] (Agreement, Section 6, pp. 15–21), and if the grievance is not satisfactorily settled "the matter shall be referred to Arbitration by either party" and "(t)he decision of the arbitrator shall be final." (Agreement, Section 7, p. 21).

Although not entirely free from doubt, we think from the foregoing a "no strike" agreement may be implied. *Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 381–382, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); *Teamsters Local v. Lucas Flour Co.,* 369 U.S. 95, 104–106, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). A violation by striking employees would support a *Boys Markets*[3] injunction and liability for damages. *Teamsters v. Lucas, supra.* However, the Agreement, in Appendix A, specifies the standard hourly wage scale, but it does not specify that an employee work at an incentive pace to receive the standard hourly rate. It is our opinion that a "no slowdown" agreement may not be implied. No case has been called to our attention holding that a "no slowdown" agreement may be implied from a collective bargaining agreement merely because it contains an implied "no strike" agreement authorizing

---

1. During this 34-week period, there were only two weeks when the employees failed to earn at least some incentive pay. These were the week ending May 9, 1976, during which the Electric Furnace Department produced 1,386,-885 pounds, and the week ending May 23, 1976, during which the department produced 1,435,-695 pounds. See Plaintiff's Exhibits 4 and 6.

2. Cf. *Affiliated Food Distributors, Inc. v. Local Union No. 229,* 483 F.2d 418, 421 (3rd Cir. 1973) wherein the parties bound themselves only to arbitrate employee grievances.

3. *Boys Markets v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

arbitration and thus supporting a *Boys Markets* injunction and resulting damages.

There is no requirement in the labor agreement that an employee work at an incentive rate beyond that required to receive the standard hourly wage rate. Although Jessop alleges the defendants are engaged in an illegal slowdown, there is no contract between the parties prohibiting the Local and its members from engaging in a slowdown.

The operation of the Electric Furnace Department was not interrupted; the employees in that Department continued to work at almost a 100% production rate. Production occurred at substantially the rate expected from the standard hourly base rate, allowing for the customary interruptions. There is no provision in the Agreement prohibiting slowdowns, although such a prohibition has been expressly provided in other collective bargaining contracts.[4] Hence, an intrusion by the court into this area would be a violation of the Norris-LaGuardia Act.[5] Under this labor Agreement the court does not possess contractual authority to enjoin a slowdown. Absent a breach of contract, Jessop has no right to an injunction under the *Boys Markets* exception to Norris-LaGuardia, and no right to recover damages in this court.

If our conclusions be in error, it is our opinion in any event that the individual defendants and USW would not be liable for damages under 29 U.S.C. § 185; the Local probably would be liable.

■ Although the 13 individual defendants are bound by the terms of the Agreement they would not be liable in damages for a breach of an implied "no strike" clause, even though their Local is liable. Thus, the individual defendants would not be liable for breach of an implied "no slowdown" agreement.[6] *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 249, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); *Sinclair Oil Corp. v. Oil, Chemical & Atomic Workers Int'l Union*, 452 F.2d 49 (7th Cir. 1971). *See also, Eazor Express, Inc. v. International Bro. of Teamsters, etc.*, 520 F.2d 951, 961 n. 5 (3rd Cir. 1975).

■ With respect to USW, there was no evidence demonstrating complicity on the part of USW or its agents in causing the slowdown. There is no proof that USW joined with the Local or with the individual defendants or with any of the other employees in the Electric Furnace Department in causing the slowdown or authorizing its continuance.[7] There was no evidence that USW had any responsibility or authority to require the employees to work at an incentive pace; or had authority to discipline employees if they failed to work at such a pace. Hence, in our opinion USW would not be liable for damages even if this case involved a *Boys Markets* situation under 29 U.S.C. § 185 and possessed authority to award damages to Jessop for breach of contract.

If our conclusions be in error and USW, the individual defendants or the Local should be held liable in damages, in our opinion a permanent injunction should not issue because in the circumstances the question of injunctive relief is moot.

---

4. In *Celotex Corp. Pittston P., Harding, Pa. v. Oil, C. & A.W. etc.*, 516 F.2d 242, 244 (3rd Cir. 1975), the collective bargaining agreement contained an express covenant by the Union that "there shall be no strikes, slow-downs, sit-downs, walk-outs, or other interference with work." In *Avco Corp. v. Local U. # 787 of Int. U., U.A.A. & A. Imp. Wkrs.*, 459 F.2d 968, 969 n. 3 (3rd Cir. 1972), the Union expressly agreed "that there shall be no strikes, walkouts, sit-downs, production retardings, or other similar interruptions of, or interferences with, work . . . ." See also *Amalgamated Meat Cut., etc. v. Cross Bros. M. P. Inc.*, 518 F.2d 1113, 1115 n. 2 (3rd Cir. 1975).

5. 29 U.S.C. §§ 101–110, 113–115.

6. The preemption doctrine precludes recovery from individual members under state law.

7. There was no proof of a mass slowdown by the 900 employees at Jessop's Washington Plant. At most only 78 to 100 employees in the Electric Furnace Department were involved. Cf. *Eazor Express, Inc. v. International Bro. of Team. etc.*, 520 F.2d 951, 963–964 (3rd Cir. 1975) involving a mass strike.

Although Jessop argues that USW, the Local and the individual defendants may repeat the slowdown if damages are ultimately awarded, this speculation does not create a controversy necessary for this court to issue a permanent injunction or retain injunctive jurisdiction. Whether or not the defendants will actually engage in another slowdown is purely a matter of conjecture at this time. If these defendants were likely to repeat a slowdown, the injunctive action would not be moot. *United States v. W. T. Grant Co.*, 345 U.S. 629, 632–633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). However, in view of the adoption of the new incentive plan of August 20, 1976, and the apparent satisfaction of the defendants with it, as indicated by their ending the slowdown and dropping all pending related discipline grievances, it is only a matter of pure speculation that these defendants will repeat a slowdown. Thus the court finds that another slowdown even in the event damages should be awarded against any of the defendants could not reasonably be expected. The action seeking a permanent injunction is moot.

An appropriate order will be entered.