**ADLEY EXPRESS COMPANY et al.**

**v.**

**HIGHWAY TRUCK DRIVERS AND HELPERS, LOCAL NO. 107.**

**Civ. A. No. 41262.**

United States District Court,
E. D. Pennsylvania.

Oct. 6, 1972.

Bernard J. Smolens, Martin Wald, Barry Simon, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for plaintiffs.

Howard J. Casper, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This case arises under section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185. Plaintiffs, some eighteen trucking companies and two industrial concerns in the metropolitan Philadelphia area who were parties to a collective bargaining agreement with defendant, Highway Truck Drivers and Helpers Local 107 (Local 107), seek some 1.5 million dollars in compensatory and exemplary damages for an alleged strike by Local 107 in breach of the no-strike provision of the agreement. The matter is now before us on plaintiffs' motion for summary judgment on the issue of liability, based upon certain record admissions of Local 107 in these proceedings.

The events in question occurred between June 20 and June 25, 1965. They stemmed directly from a work stoppage that commenced on June 11, 1965, at the terminal of Roadway Express, Inc. (not a party to this action), whose employees were also represented by Local 107. The events occurring at Roadway have been detailed elsewhere and need not be repeated here.[1] This is the second motion for summary judgment filed by plaintiffs in this case. The first motion, filed on June 5, 1969, relied essentially upon the admissions contained in Local 107's answer to plaintiffs' complaint. That motion was denied by Judge Harold K. Wood of this Court on July 9, 1969. In a written opinion, 47 F.R.D. 356, Judge Wood held that the admissions of Local 107 in its Answer were insufficient, on three issues, to permit a determination of liability as a matter of law. Those three points were (1) "whether or not the conduct of the Union amounted to a strike" ; (2) "whether, assuming that the conduct of the employees amounted to a strike, such ac-

---

1. *See* Roadway Express, Inc. v. Highway Truck Drivers & Helpers Local 107, 299 F.Supp. 1058 (E.D.Pa.1969). This action resulted in a judgment of $970,000, subsequently compromised, against Local 107.

tions were approved or ratified by the appropriate Union officers" ; (3) whether "the acts of the defendants constituted an authorized strike with regard to each of the plaintiffs."

Following this action of Judge Wood, the case was assigned to the docket of Judge A. Leon Higginbotham, Jr. The pretrial procedures thereupon initiated by Judge Higginbotham have, after a tortuous course, resulted in a substantially burgeoned record of admitted facts, which forms the basis of the summary judgment motion before us. The additional admissions were formalized by the filing of a Memorandum and Order by the undersigned on October 19, 1971. Since our decision on the present motion is so closely intertwined with that Memorandum, a copy of it is attached as an Appendix to this opinion.

II. *Statement of the Admitted Facts*

The facts now admitted, from which our decision on the renewed motion must stem, are as follows:

The plaintiffs are eighteen motor carriers engaged in transporting freight and merchandise in interstate commerce and in local cartage, and two manufacturing concerns with substantial motor freight operations. Motor Transport Labor Relations, Inc. (MTLR) is a nonprofit Pennsylvania corporation organized for the purpose of representing its members in all labor relations matters between each member and any labor union representing employees of that member. Each plaintiff has been a member of MTLR at least since September 1, 1964. Defendant, Local 107, is a local union affiliated with the Eastern Conference of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. At all times material to plaintiffs' cause of action, the relationship between Local 107 and the motor carrier members of MTLR was governed by a collective bargaining agreement effective for the period from September 1, 1964, to March 31, 1967.

Article 43, Section 1 of the collective bargaining agreement provided that:

The Union and the Employers agree that there shall be no strike, lockout, tie-up or legal proceedings without first using all possible means of a settlement as provided for in this Agreement, of any controversy which might arise.

The collective bargaining agreement further provided in Article 43, Section 7 that the Union would furnish to the truckers a list of Union representatives who would have sole authority to act for Local 107 in calling or instituting strikes or any stoppages of work. From September 1, 1964, through at least June 20, 1965, Local 107 was represented by its executive officers and business agents in its relations with MTLR and the member companies of MTLR, including plaintiffs. At all times material to plaintiffs' cause of action, Michael Hession (Hession) was the secretary-treasurer and chief executive officer of Local 107.

On or about June 11, 1965, a dispute arose between Roadway Express, Inc., a member company of MTLR, and its employees who were members of Local 107. On Sunday, June 20, 1965, Local 107 held a general membership meeting at the Hotel Philadelphia in Philadelphia.

All executive officers of Local 107 and all but one of its business agents were present at the meeting. At that meeting, regular business was dispensed with in order that the dispute between Local 107 and Roadway Express, Inc. might be discussed. Following discussion, Hession recommended that the Local 107 membership support the pre-existing Roadway strike by refusing to report to work for MTLR member companies, including plaintiffs. The membership of Local 107 unanimously voted in favor of this proposed general work stoppage directed against the member companies of MTLR, including the plaintiffs.

The recommendation of Hession and the action of the membership in approv-

ing the recommendation was described in the official minutes of the June 20 meeting as follows:

> Jack Wible from Harris Express then made a motion to dispense with the regular business so that the Roadway problem could be discussed. The motion was seconded by William Rinehart, put to a vote and unamiously [sic] passed.
>
> On the subject Secretary Treasurer Michael Hession then recommended that the membership take a holiday until such time as the Roadway dispute was settled. The membership by acclimation unamiously [sic] decided to follow the recommendation.

Beginning at 12:01 a. m. on Monday, June 21, Local 107 members who were employed by the members of MTLR, including each of the plaintiffs, failed to report to work.

At approximately 11:00 a. m. on June 21, Judge Leo Weinrott of the Court of Common Pleas of Philadelphia County issued a preliminary injunction against Local 107 and its officers and business agents. Judge Weinrott's order in part enjoined Local 107 "and all other persons acting on [its] behalf" from "taking any action or pursuing any course of conduct which is intended to or has the necessary effect of violating, interfering with or disturbing the present contractual relationship between [MTLR] and Local No. 107." That evening a special membership meeting of Local 107 was held at the Hotel Philadelphia. The meeting was attended by all the officers and most of the business agents of Local 107. At the meeting Hession addressed the membership on the subject of the injunction issued by Judge Weinrott and stated that Local 107 and its members would be in violation of the injunction if the work stoppage continued.

On Tuesday, June 22, employees of MTLR member companies (including plaintiffs) who were members of Local 107 continued their failure to report for work. The same day, upon finding that Local 107 had not complied with the pro-

visions of the preliminary injunction, Judge Weinrott issued an order directing the Sheriff of Philadelphia County to use all necessary resources to enforce the provisions of the injunction. On Friday, June 25, after a hearing, Judge Weinrott found the officers and business agents of Local 107 in civil contempt of the preliminary injunction and ordered that for each day they failed to comply with the injunction, Local 107 would be fined $10,000 and each officer and business agent $500, the fine to be paid to MTLR.

On Saturday, June 26, Local 107 held a special membership meeting at Convention Hall in Philadelphia. The meeting was attended by all the executive officers and most of the business agents of the local. Hession informed the union membership of Judge Weinrott's civil contempt order of June 25 and ordered the membership to return to work. Following that meeting, union employees of MTLR member companies, including plaintiffs, went back to work. By stipulation of counsel dated July 1, 1965, further hearing on the preliminary injunction entered by Judge Weinrott was waived, and the injunction was made permanent, without prejudice to the right of MTLR to seek damages.

The city-wide work stoppage by the membership of Local 107 continued from June 21, 1965, through June 25, 1965. This stoppage was accompanied by violence and breaches of the peace on the part of members of Local 107, many of whom were arrested on criminal charges. During the work stoppage, the member companies of MTLR, including plaintiffs, were unable to use equipment located in the Philadelphia area in their operations, were unable to fulfill contracts of carriage, and were otherwise prevented from conducting their business operations.

### III. *Discussion*

A. Elements Necessary to Establish Liability

In order for plaintiffs to prevail on the issue of liability, they must es-

tablish four propositions as a matter of law: (1) the conduct of Local 107 amounted to a strike in violation of the collective bargaining agreement; (2) the strike was against each of the plaintiffs; (3) the strike continued from 12:01 a. m. on June 21, 1965, until June 26, 1965; and (4) Local 107 remained in breach of its collective bargaining agreement with plaintiffs throughout the period of the strike. These points, incidentally, are the same ones that Judge Wood, in his opinion, held were then still in dispute. Of course, in the present posture of the case, the plaintiffs can prevail only if on each of these points "there is no genuine issue as to any material fact" worthy of submission to a jury. F.R.Civ.P. 56(c). It hardly needs recitation that on summary judgment the inferences to be drawn from the record facts before the court must be viewed in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). "[T]he moving party . . . ha[s] the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodge[s] must be viewed in the light most favorable to the opposing party." Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); Janek v. Celebrezze, 336 F. 2d 828, 834 (3d Cir. 1964); Toppi v. United States, 327 F.Supp. 1277, 1278 (E.D.Pa.1971). All that is required to defeat a motion for summary judgment is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. First Nat. Bank v. Cities Service Co., 391 U.S. 253, 288–289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

With these guiding principles in mind, we proceed to consider whether the plaintiffs have met their burden on each essential issue.

    B. Did Local 107's Conduct Constitute a Strike Against Each of the Plaintiffs in Breach of the Collective Bargaining Agreement? Did the Strike Continue Until June 26, 1965?

▮ The admitted facts posit that the June 20, 1965, meeting was a general membership meeting which all executive officers of Local 107 and all but one of its business agents attended. They establish that Michael Hession, the Local's chief executive officer, recommended that Local 107 members support the Roadway strike by refusing to report to work for MTLR member companies, and that the membership unanimously voted in favor of the proposed general work stoppage. It is also admitted that beginning at 12:01 a. m. on June 21, 1965, Union members failed to report to work at each of the plaintiff companies, and that the member companies of MTLR, including the plaintiffs, were unable to use their equipment, were unable to fulfill their contracts, and were otherwise prevented from conducting their business operations during the work stoppage. What genuine factual dispute can there be, then, over the proposition that the Union's conduct amounted to a strike in breach of Article 43, Section 1 of the collective bargaining agreement?

Local 107's contention on this point is based on the official minutes of the June 20 meeting, indicating that the membership voted merely to follow Hession's recommendation that they "take a holiday" until the Roadway dispute was settled. The Union thus argues that it did not go on strike, but rather, it "took a holiday," and that the nomenclature the Union itself used in declaring the stoppage is a significant factor in the judicial determination of whether a particular work stoppage amounted to a strike. This contention has been rejected before and must be rejected again.

Section 501(2) of the Taft-Hartley Act, 29 U.S.C. § 142(2), defines "strike" to include "any strike or other concerted stoppage of work by employees . . . and any concerted slowdown or other

concerted interruption of operations by employees." This characterization of a concerted stoppage of work or a concerted interruption of operations as a strike is in accord with the generally accepted definition of that term. *See* United Federation of Postal Clerks v. Blount, 325 F.Supp. 879, 884 (D.D.C.) (three-judge court), *aff'd per curiam,* 404 U.S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971); NLRB v. Illinois Bell Tel. Co., 189 F.2d 124, 127 (7th Cir.), *cert. denied,* 342 U.S. 885, 72 S.Ct. 173, 96 L.Ed. 663 (1951); Tennessee Valley Authority v. Local Union No. 110, of Sheet Metal Workers, etc., 233 F.Supp. 997, 1000 (W.D.Ky.1962). In the absence of a controlling definition in the collective bargaining agreement itself, we feel that this is the proper definition to apply in interpreting Article 43, Section 1 of that contract.

A rose by any other name? Directly on point is United Elec., Radio & Mach. Workers of America v. Oliver Corp., 205 F.2d 376 (8th Cir. 1953), where the union labeled its work stoppage a "panther hunt." It was nonetheless held liable for its breach of a no-strike clause. *Accord,* United States v. International Union, United Mine Workers, 77 F.Supp. 563, 566–567 (D.D.C.1948), aff'd, 85 U.S. App.D.C. 149, 177 F.2d 29, cert. denied, 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535 (1949). The cases have uniformly asserted substance over formality in considering this question. In Massey Gin & Mach. Works, Inc., 78 N.L.R.B. 189 (1948), the Board rejected the company's contention that union members had quit their jobs rather than struck; even though there was no picketing and no announcement of an intention to strike, the Board noted,

> The cessation of work by a group is no less a strike because the group may not have labeled it a strike, or engaged in the additional activities which usually accompany a strike.

*Id.* at 190. More recently, in Favino Mechanical Constr. Ltd. v. Local 269, Plumbing & Pipefitting Indus., 66 CCH Lab.Cas. ¶ 12,180 (S.D.N.Y.1971), the court faced the question whether certain activity constituted a strike. In an oral opinion, Judge Lasker answered in the affirmative:

> The record establishes that, while no strike has been formerly [*sic*] voted, none of the employees of plaintiffs are working. In the circumstances, and with admission even on the part of defendant that a dispute exists, the most reasonable inference is that the stoppage is not fortuitous or unconcerted, and indeed there is no evidence in the record to sustain any contention to the contrary.

*Id.* at 22,670.

■ There is, then, no magic appellation indispensable to a judicial determination that a union has engaged in a strike. A concerted work stoppage, recommended by the Union's officers, voted unanimously by the business agents and the rank and file, implemented by the failure of the Union membership to report for work, and resulting in cessation of business operations of the employers, is a strike in violation of a no-strike clause, whatever label the union attaches to it. Certainly a contrary result was not contemplated by the parties who ratified Article 43, Section 1 of the collective bargaining agreement, in which the Union forswore not only "strikes," but "tie-ups" as well.

We have noted the admissions which establish that the work stoppage was directed against all the MTLR member companies (including the plaintiffs); that the members of Local 107 employed by members of MTLR (including the plaintiffs) failed to report to work beginning at 12:01 a. m. on June 21, 1965; that notwithstanding Judge Weinrott's injunction and Secretary-Treasurer Hession's recommendation to the Union membership, members of Local 107 continued to fail to report to work on June 22; that they did not return to work until June 26, 1965; and that during the work stoppage the member companies of MTLR (including the plaintiffs)

were unable to use their equipment or conduct their business.

There are no countervailing facts of record. There is, then, no genuine issue of material fact, even when the admitted facts are interpreted most unfavorably to the moving party's interest, not only as to whether the Union's conduct constituted a strike in breach of the no-strike clause of the collective bargaining agreement, but also as to whether the strike was against all plaintiffs and whether it lasted until June 26. Thus plaintiffs are entitled to summary judgment on those three issues, and as to those issues their motion is hereby granted.

### C. Did the Union Remain Responsible for the Strike Throughout Its Duration?

██ The final and most vexing question before us is whether Hession's actions at the June 21 meeting are, as a matter of law, insufficient to absolve the Union from liability for the continuing breach of the collective bargaining agreement from June 22 through June 25. For the reasons that follow, we have concluded that on the present record there remains a genuine dispute as to material fact, so that summary judgment on this last remaining issue of liability must be denied, and the issue resolved at trial.

We of course have before us on this issue the facts stated earlier in this Opinion. The plaintiffs contend that those facts mandate the grant of summary judgment. More specifically, plaintiffs contend that Hession's admonition at the June 21 membership meeting that the members would be in violation of Judge Weinrott's injunction if the stoppage continued is insufficient, as a matter of law, to insulate the Union from civil liability for actions that had been set in motion at Hession's urging and by unanimous vote of the local's leadership and its rank and file the night before. However, in addition to the admissions we have recited, we have before us for purposes of the summary judgment motion the allegations of para-

graphs 14 and 16 of the Union's Answer to the Complaint, which allege that Hession "ordered" the Union members back to work and that "any further action by the employees of the member companies in refusing to go to work was of their own volition and was not induced, authorized, or ratified by the officers or agents of Local No. 107." It is clear since the 1963 amendment to F.R.Civ.P. 56(e) that a party cannot successfully oppose a motion for summary judgment merely by standing on a naked allegation in his pleading that is at issue with facts contained in supporting affidavits presented by the moving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 153–161, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). And, in this case, Local 107 is confronted not just with affidavits, but also with record admissions. However, the record admissions are not inconsistent with the factual allegations of paragraphs 14 and 16 of the Answer, nor have the plaintiffs produced any contradictory evidence; hence, those paragraphs are properly before us, along with the admissions, on this motion.

██ As a general proposition, a functioning union is held responsible for the mass actions of its members. Vulcan Materials Co. v. United Steelworkers of America, 430 F.2d 446, 455 (5th Cir. 1970), cert. denied, 401 U.S. 963, 91 S. Ct. 974, 28 L.Ed.2d 247 (1971); United States v. Brotherhood of R. R. Trainmen, 96 F.Supp. 428, 431 (E.D.Ill.1951); United States v. International Union, United Mine Workers, 77 F.Supp. 563, 566–567 (D.D.C.1948), aff'd, 85 U.S.App. D.C. 149, 177 F.2d 29, cert. denied, 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535 (1949). This "rule" is not a statement of the law, but a common-sense proposition of logical factual inference. In United States v. International Union, United Mine Workers, supra, despite a lack of evidence that union leaders had called a strike, the court nevertheless inferred from a mass walkout that the union was responsible: "[M]en don't act collectively without leadership. The idea of suggesting that from 350,000 to

450,000 men would all get the same idea at once, independently of leadership, and walk out of the mines, is of course simply ridiculous." 77 F.Supp. at 566. Furthermore, when, as here, the union leadership instigates the decision to go out on strike, it can be inferred that the leadership also plays a role in the decision when work will resume. Mere failure to take substantial steps to get the membership back to work can constitute sufficient union involvement in the illegal strike to sustain its liability. Vulcan Materials Co. v. United Steelworkers of America, *supra*, 430 F.2d at 456–457; United States v. International Union, United Mine Workers, *supra*, 177 F.2d at 36; *see* United Constr. Workers v. Haislip Baking Co., 223 F.2d 872, 876 (4th Cir.), *cert. denied*, 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754 (1955); United States v. International Union, United Mine Workers, 89 F.Supp. 179, 181 (D.D.C. 1950), *appeal dismissed as moot*, 88 U.S. App.D.C. 341, 190 F.2d 865 (1951). The court in *Vulcan Materials Co., supra*, articulated and applied the standard that a union cannot be exonerated from liability for an illegal strike unless its leaders take action which could reasonably be expected to effectuate a return to work. 430 F.2d at 457. And in United States v. Brotherhood of Railroad Trainmen, *supra*, the court found tacit union approval of an illegal strike in the union's failure to discipline striking members. 96 F.Supp. at 432. While the Union has the burden of demonstrating that it exerted very substantial and sincere efforts to get the men back to work if it is to avoid liability in these circumstances, the foregoing precedents refute the plaintiffs' contention that a union is responsible for any strike that it instigates, regardless of any unsuccessful effort it may make to terminate it.

The record before us is far from impressive as to the Union leadership's efforts to get the men back to work at the end of the first day of the strike. However, there is some indication that officials of Local 107 did make such an effort, and we have before us no counter-

vailing evidence that Hession's communications to the Union rank and file were not made in good faith, *see United States v. International Union, United Mine Workers, supra*, 89 F.Supp. at 181, or that other communications were made by Union officers to the membership encouraging them to continue the strike, *cf. Adickes v. S. H. Kress & Co., supra*. And on a motion for summary judgment, unlike in a decision after trial in a nonjury case, we are not free to draw inferences unfavorable to the Union when other inferences are supportable. At the trial both parties will have the opportunity to present additional evidence, if any there be, bearing on the Union's responsibility for the continuation of the strike after the first day. Since on the present record we are unable to say that the facts are genuinely undisputed so that only legal issues remain, summary judgment is denied on the question of the Union's liability for continuation of the strike after June 21, 1965.

D. Does Judge Weinrott's Decision Finding the Union in Civil Contempt Conclude the Issue by Collateral Estoppel or Res Judicata?

Plaintiffs have urged that Judge Weinrott's decision finding the Union in civil contempt of his injunction collaterally estops the Union from relitigating its liability for continuation of the strike. Collateral estoppel is properly invoked when the following requirements are met:

The issue to be concluded must be the same as that involved in the prior action. In the prior action, the issue must have been raised and litigated, and actually adjudged. The issue must have been material and relevant to the disposition of the prior action. The determination made of the issue in the prior action must have been necessary and essential to the resulting judgment.

1B Moore's Federal Practice ¶ 0.443[1] (1965) (footnotes omitted); *accord, Lynne Carol Fashions, Inc. v. Cranston*

Print Works Co., 453 F.2d 1177, 1182 (3d Cir. 1972). Here the "issue to be concluded" is the Union's liability for its members' strike from June 22 through June 25. Having examined the data supporting plaintiffs' motion, we agree that this issue was material and relevant to the contempt proceeding before Judge Weinrott and was raised and litigated. It was also an "ultimate fact," rather than a "mediate datum," in both that proceeding and this one. *See* The Evergreens v. Nunan, 141 F.2d 927 (2d Cir. 1944). But we cannot accept the plaintiffs' contention that the issue was actually decided by Judge Weinrott or that it was essential to his decision.

Judge Weinrott's injunction, the text of which is set out in the margin, in very broad terms prohibited the Union and its officers from (a) impeding access to the terminals of plaintiff companies, (b) picketing those terminals, (c) congregating near those terminals, (d) refusing to refer members from the Union hiring hall to plaintiffs for employment, and (e) violating the collective bargaining agreement.[2] Judge Weinrott's subsequent order holding the Union and its officers in contempt states simply that:

> [I]t is adjudged that the Defendant Local Union No. 107 and the following named persons are in civil contempt of the Decree of this Court of June 21, 1965 . . . .

■ The problem with plaintiffs' collateral estoppel argument is that Judge Weinrott made no findings of fact specifying what conduct he found to have been violative of the injunction, or the basis upon which he held the Union, as opposed to the individuals, in contempt, or indeed specifying which provision or provisions of the injunction were violated. Thus we are unable to say that any one fact was "necessary and essential" to his judgment. Since the prohibition of the Union's violation of the contract was only one of several parts of the injunction, this issue was not necessarily adjudged as part of Judge Weinrott's order holding the Union in contempt. While it indeed may have been, in the absence of findings we cannot hold that it was.

■ Plaintiffs have also couched their argument in terms of the doctrine of res judicata. This doctrine is, of course, inapplicable, for the cause of action in the contempt proceeding (the violation of Judge Weinrott's injunction) and the cause of action here (breach of a contractual no-strike clause) are unrelated. See 1B Moore's Federal Practice ¶ 0.410[1] (2d ed. 1965).

### IV. *Conclusion*

In view of the foregoing discussion, it will be necessary that we conduct a trial on the merits of the one remaining liability issue: whether the Union's liability for the strike continued after the

---

2. The injunction was worded as follows:

ORDERED AND DECREED

1. That an Injunction be issued, preliminary until hearing is held enjoining and restraining the Defendants and all other persons acting on behalf of them or any of them.

(a) From preventing or attempting to prevent by picketing, violence, intimidation or coercion in any form, any person or persons from freely entering or leaving any terminal or plant of any member company of Motor Transport Labor Relations, Inc. (hereinafter referred to as "MTLR"), as shown in Appendix "I" attached hereto and by this reference made a part hereof, or any terminal or plant of customers of any such member company;

(b) From having any pickets in front of or in close proximity to any entrance of the premises of any member company of MTLR, as aforesaid;

(c) From congregating, loitering or gathering in front of, near to or about the premises of any member company of MTLR or the entrances thereto at any time;

(d) From refusing to refer employes from the Local No. 107 hiring hall to member companies of MTLR;

(e) From taking any action or pursuing any course of conduct which is intended to or has the necessary effect of violating, interfering with or disturbing the present contractual relationship between the Plaintiff and Local No. 107.

meeting of June 21 and for its duration. Neither party has demanded a jury trial; hence, we will determine this issue in a nonjury trial to be listed shortly, deferring the trial on the issue of damages to a later date should it become necessary. To expedite trial of the issue, the parties are directed to confer immediately and to submit to the Court, on or before Friday, October 20, 1972, at 5:00 p. m., a proposed final pretrial order in accordance with our Standing Order pertaining to pretrial conferences in certain cases, which is hereby made applicable to this case. Final pretrial conference will be held on Monday, October 23, 1972, at 11:00 a. m. in the chambers of the undersigned.

## APPENDIX

In the United States District Court for the Eastern District of Pennsylvania

Civil Action No. 41262

Adley Express Company, et al.

v.

Highway Truck Drivers & Helpers, Local No. 107

## MEMORANDUM AND ORDER

EDWARD R. BECKER, District Judge.

October 19, 1971

We have before us the motion of the defendant Highway Truck Drivers & Helpers, Local No. 107 ("Local 107") for an extension of time within which to answer requests for admissions. Plaintiffs are some twenty trucking firms located in the metropolitan Philadelphia area who seek damages in the sum of $1,500,000 (including both compensatory and exemplary damages plus interest) from Local 107 under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, for an alleged strike in violation of the no-strike provision of their collective bargaining agreement. The events in question occurred between June 20th and 25th, 1965 and stemmed from a work stoppage which commenced at the Roadway Express Company terminal, also serviced by Local 107, on June 11, 1965.[1] In its answer, the union denied that it had gone on strike, or that it is liable in damages because its men struck without proper authorization from the appropriate union officers. A good part of the controversy has been over whether a "holiday" admittedly taken by the union constituted a strike.

The litigation has been protracted. Plaintiffs are still represented by their original counsel. Local 107 now has its fourth attorney in the case, a factor relevant to the present motion, which arises out of the following circumstances.

In March 1970, the case was on the docket of Judge A. Leon Higginbotham, Jr., who scheduled a pretrial conference for March 30, 1970. Judge Higginbotham had made his Standing Order relating to pretrial conferences applicable to the case. That Order requires the parties to submit, in advance of the pretrial conference, an extensive pretrial memorandum, including, *inter alia*, proposals for stipulations of uncontested facts. This procedure effects a narrowing of the issues and shortens the trial, a particularly salutary result in this case where trial estimates have ranged upwards of two months.

In compliance with Judge Higginbotham's Standing Order, plaintiffs filed, on March 9, 1970 a proposed final pretrial order containing a (proposed) statement of facts in thirty-nine numbered paragraphs. Purportedly in compliance with the Standing Order, counsel for Local 107 filed, on March 25, 1970, a proposed final pretrial order, in which he replied to the plaintiffs' statement of facts, also in thirty-nine numbered paragraphs. Twenty of the thirty-nine paragraphs

1. See Roadway Express Inc. v. Highway Truck Drivers & Helpers, Local 107, 299 F.Supp. 1058 (E.D.Pa.1969). This action resulted in a judgment of $970,000 against Local 107 which was subsequently compromised.

were admitted in their totality.[2] A number of others were partially admitted and partially denied; a number were denied in part, without concomitant partial admission; and a number were neither admitted nor denied, but were, to put it bluntly, simply evaded.

Judge Higginbotham held the pretrial conference as scheduled on March 30, 1970. Upon review of the plaintiffs' proposed statement of facts and Local 107's answers, Judge Higginbotham informed the parties that it was his view that Local 107's answers to the 19 proposed statements which were not admitted were not adequate. Following the pretrial conference, Judge Higginbotham entered an Order which precipitated the events culminating in this Opinion. The Order reads as follows:

"AND NOW, to wit, this 3rd day of April, 1970, it is hereby ordered and decreed that each of the numbered paragraphs, from 1 to 39, inclusive, of Part III of plaintiffs' Proposed Final Pre-Trial Order be and they hereby are declared to be the equivalent of Requests for Admission filed under Rule 36 of the Federal Rules of Civil Procedure, and defendant is hereby required, within two weeks from the date of this Order, to respond to each of the aforesaid numbered paragraphs in the manner provided in Rule 36."

Notwithstanding Judge Higginbotham's Order, no response was filed by Local 107 within two weeks. Moreover, no response was filed between the filing of Judge Higginbotham's Order and August of 1971. (The docket indicates that it was mailed to all counsel.) In the interim, new counsel had been retained by the union, and the case had been reassigned on the Court's docket to the undersigned, who, in February 1971, called a conference of counsel. This conference resulted in extensive settlement negotiations which at first seemed promising, but which finally broke down in late July 1971. On August 5, 1971, the Court held a pretrial conference with a view towards setting a trial date. At that conference, counsel for plaintiffs announced his intention to file a motion for summary judgment on the basis of the facts admitted by virtue of Local 107's failure to file a response to plaintiffs' statement of facts in accordance with the terms of Judge Higginbotham's Order.[3] At that juncture, Local 107's new attorney stated that he would file the motion for an extension of time within which to answer the requests for admissions; that motion is the subject matter of this Opinion.

The grounds of the motion may be summarized as follows: (1) the union has new officers; (2) the union has new counsel; (3) when previous counsel (i. e., the one who represented the union at the time of the pretrial conference) turned his file over to present counsel, Judge Higginbotham's Order was not contained therein, and previous counsel has "raised some questions as to whether or not he had ever received a copy of Judge Higginbotham's Order";[4] (4) the union's relations with plaintiffs have been good since June of 1965; (5) since that date, the union has been adversely affected as a result of the *Roadway* judgment which, although settled, constitutes a financial drain upon the union treasury; (6) the union's membership

---

2. Nos. 1, 2, 3, 4, 5, 6, 7, 10, 11, 13, 14, 15, 23, 24, 25, 30, 31, 32, 33 and 34.

3. A motion for summary judgment had been considered by Judge Harold K. Wood, Judge Higginbotham's predecessor in the case, and denied in an Opinion and Order dated July 9, 1969. Such a motion can, of course, be renewed if additional facts come into the record. Middle Atlantic Utilities Company v. S.M.W. Development Corp., 392 F.2d 380, 384 (2d Cir. 1968) ; Allstate Finance Corp. v.

Zimmerman, 296 F.2d 797, 799 (5th Cir. 1961).

4. The union does not go so far as to deny that previous counsel received Judge Higginbotham's Order, which the Court docket shows to have been mailed. Plaintiffs suggest that former counsel failed to respond because he, in good conscience, could not. Notwithstanding the Court's urging, the union has not provided a meaningful record on this point.

has decreased by four or five thousand members since 1966; (7) the union does not possess an ample treasury; and (8) in view of its emaciated financial condition, brought to pass by diminished dues and the *Roadway* judgment, to deny or impair its opportunity to defend the plaintiffs' allegations, even on the question of liability (as opposed to damages), would seriously harm it and substantially impair its effectiveness as a functioning labor organization.[5]

Plaintiffs vigorously oppose the motion for extension of time. They contend that the petition is untimely, that it lacks merit, and that, in any event, Judge Higginbotham's Order represents the "law of the case."

The "law of the case" doctrine is well established in this circuit. *See* TCF Film Corporation v. Gourley, 240 F.2d 711 (3d Cir. 1957); United States v. Wheeler, 256 F.2d 745 (3d Cir. 1958). Judge Maris spoke for the Court en banc in the *TCF* case. *Inter alia,* he stated:

"The petitioners base their claim for relief by way of mandamus and prohibition upon the rule that judges of co-ordinate jurisdiction sitting in the same court and in the same case should not overrule the decisions of each other, a rule which this court followed in Jurgenson v. National Oil &

Supply Co., 3 Cir., 1933, 63 F.2d 727, 729, and Price v. Greenway, 3 Cir., 1948, 167 F.2d 196, 199–200, and which has been applied in many other cases in this circuit as well as elsewhere. . . .

It is true that the Dictograph case indicates that the rule under discussion is not absolute and all-embracing in its scope. There are, as that case illustrates, exceptional circumstances under which courts have held that one judge of a district court may overrule a decision by another judge of his court in the same case. Nonetheless we think that the rule is a most salutary one. We adhere to it and hold that except under the most extraordinary circumstances it should be followed by the district judges of this circuit. The reasons for the rule have been reiterated in the many cases in which it has been applied and need not be repeated here in detail. It is sufficient to say that we regard it as a necessary rule of judicial comity to preserve the orderly functioning of the judicial process."

Judge McLaughlin, in the *Wheeler* case, observed:

"In other words there are occasional situations in which a judge cannot avoid placing himself in a position which may require him to reconsider

---

5. Proposed statement of fact No. 39 read as follows:

"(39) As a result of this work stoppage, plaintiffs sustained damages in the approximate amounts as set forth below:

| | |
|---|---|
| Adley Express Company | $ 56,903.00 |
| Air Reduction Company, Inc. | 311,336.00 |
| Associated Transport, Inc. | 68,500.00 |
| Bunting Bristol Transfer, Inc. | 3,897.52 |
| P. Callahan, Inc. | 20,002.01 |
| Carolina Freight Carriers Corporation | 67,637.00 |
| Consolidated Freightways Corporation of Delaware | 35,629.00 |
| W. T. Cowan, Inc. | 15,509.00 |
| The Davidson Transfer & Storage Company | 44,498.00 |
| Elkton Trucking Company | 11,144.56 |
| Farruggio's Bristol & Phila. Auto Express | 6,809.32 |
| Galloway Bros. Transportation Company | 5,430.00 |
| Hemingway Transportation, Inc. | 41,321.00 |
| M&M Transportation Company | 38,667.00 |
| Morell-Felin Co. | 36,209.51 |
| Mushroom Transportation Co., Inc. | 32,865.00 |
| Pennsylvania Transfer Company of Philadelphia, Inc. | 10,798.00 |
| Schuster's Express, Inc. | 20,768.21 |
| Service Freight System, Inc. | 43,968.00 |
| Spector Freight System, Inc. | 63,203.00" |

Plaintiffs, however, *do not contend* that the failure of Local 107 to respond to Judge Higginbotham's Order obviates the necessity of their proving damages. While claiming entitlement to summary judgment on liability, they affirm that they must prove damages, even though that proof will be extensive and involved.

a point already earlier decided in the same case by another judge of the same court. The TCF case in fact presented that very situation. The crux of the matter, then, is not whether a second judge on reconsideration of a question can or should overrule the first judge but whether he may properly entertain the reconsideration at all."

■ We agree with plaintiffs that the Order of Judge Higginbotham is the "law of the case." We do not find in defendant's motion exceptional or extraordinary circumstances of the type spoken of by Judge Maris which would justify the overruling of Judge Higginbotham's Order. As a matter of fact, the nature of the allegations in the motion is inherently peripheral to the types of circumstances which are required for a judge to overrule an Order of a brother judge in accordance with the principles of *TCF* and *Wheeler*. Accordingly, Local 107's motion for extension of time within which to answer requests for admissions will be denied.

Refusal of the union's motion is, however, not the end of the deliberations before us. In anticipation that its motion for extension might be denied, resulting in the admission of additional facts which could be utilized against it in connection with a renewed motion for summary judgment, Local 107 has raised the question as to precisely what additional facts are before us by reason of its failure to respond to Judge Higginbotham's Order of April 3, 1970. Plaintiffs maintain that, with the exception of the question 39 on damages (see footnote 5, *supra*), the automatic effect of Judge Higginbotham's Order is to place the entire subject matter of the proposed statements before us as being established in evidence. The union, on the other hand, argues that to do so would stretch Rule 36 of the Federal Rules of Civil Procedure beyond its intended purpose. It contends: (1) that two of the most crucial "requests" were not proper requests for admission at all, calling for

conclusions of law (*i. e.*, whether the union's actions constituted a strike); (2) that even in the absence of answers to the requests, Judge Higginbotham would ultimately have been required to rule on whether, because of the (alleged) impropriety of the requests, they could support a binding admission; and (3) having done so, Judge Higginbotham would have had to conclude that they could not. In addition, while conceding that the answers to the proposed statement of facts filed by predecessor counsel were not adequate, the union's present counsel argues that there were *some* cognizable answers contained therein. He contends that Judge Higginbotham's Order was, in essence, an "order in gross"; that it was directed to the inadequacy of the union's responses as a whole with a view towards sharpening them and narrowing the record, and that it did not foreclose the possibility that at least a few of the responses in previous counsel's proposed final pretrial order would have been deemed adequate by him had he examined them separately. Accordingly, union counsel has suggested an alternative cause of action in the event of denial of the motion for extension: that plaintiffs' proposed statement of facts and defendant's response thereto in their respective proposed final pretrial orders be reexamined; that the plaintiffs' proposed statements be treated as requests for admissions, and that the union's answers filed by its former counsel be treated as responses thereto; that the Court consider the adequacy of the requests and the responses as it would on a duly filed motion seeking that admissions be declared; that if any of the requests were improper, they should be disregarded, and that if any of the answers were sufficiently responsive to pass muster, they should be permitted to stand.

■ The union contends that this would be an equitable course of action in the event of our failure to grant its motion for extension. We agree. We will therefore reexamine the plaintiffs' proposed statement of facts and the defend-

ant's response thereto, treat the proposed statement as requests for admissions and the answers as responses thereto, and consider the responses as though on motion seeking an order that admissions be declared. We do so because we believe: (1) that Judge Higginbotham would have indeed measured the effect of his Order by the terms of Rule 36 (*i. e.*, what he would or would not have deemed admitted); and (2) because we do not believe that Judge Higginbotham would have wished to deprive the union of the benefit of anything (and, as we will see below, it amounts to but one item out of the admitted 19) which it did plead properly in the first set of proposed answers. We do not believe that the "law of the case" principle, discussed *supra,* is applicable to this phase of the matter, since we are only here *interpreting* Judge Higginbotham's Order. Out of an abundance of caution, however, we have solicited his view of the matter (see *infra*).

Implementation of this course of action does create a threshold problem: Rule 36 was amended effective July 1, 1970, after the twenty-day period had run, but before our present determination. We will measure the union's answers by the Rule in effect as of the time they were made. Therefore, using Judge Higginbotham's parlance of "request for admissions" and responses thereto, and setting aside the 20 requests which were admitted, and request 39 on damages, which plaintiffs have abandoned, we have examined the remaining 18 requests and responses with a view towards determining whether they comply with Rule 36 of the Federal Rules of Civil Procedure.

Our examination confirms the wisdom of Judge Higginbotham's Order. We find that the responses to requests for admissions numbers 9, 16, 17, 18, 19, 21, 22, 26, 27, 28, 29, 35, 36, and 38 are inadequate under the Rules. We, there-

fore, deem them to be admitted. This leaves but four requests out of the thirty-eight which would not be admitted, numbers 8, 12, 20, and 37. We will review these four requests seriatim, though not in numbered order.

Request number 37, relating to damage allegedly done by members of Local 107 to the property and equipment of plaintiffs, appears to have been adequately denied in the original proposed answers. That it is not an important factor in the case is demonstrated by plaintiffs' failure to claim any significant property damage in their detailed statements of claim filed pursuant to the request of the undersigned during the course of settlement negotiations. Almost the entirety of the stated claim is for consequential damages in the nature of terminal maintenance costs and loss of net profits. There is no reason, therefore, for the record to be encumbered or confused by admission 37.

Request number 12 relates to the question of whether the union's actions involving Roadway Express constituted a "strike." While the union's answer is not particularly responsive, it maintains that the *request* is not appropriate in that it calls for a conclusion of law. Request number 12 asked the union to admit that "[a]s a result of said dispute a strike was called by Local Union 107 against Roadway Express, Inc., which strike persisted at least through June 1965." In order to admit that request, the union would have to draw the legal conclusion that the work stoppage against Roadway constituted a strike. Old Rule 36 only requires the answering party to admit "the truth of any relevant matters of *fact* set forth in the request." (emphasis added). Fed.R.Civ. P. 36(a).[6] While there was a split of authority on this point, the majority held that requests calling for conclusions of law or mixed law and fact were improper and outside the scope of Rule 36.

6. It should be noted that revised Rule 36 allows "request[s] that relate to state-

ments or opinions of fact or of the application of law to fact . . . . . "

Mahaney v. Doering, 260 F.Supp. 1006 (E.D.Pa.1966); 4 J. Moore, Federal Practice 36.04[4] (2d ed. 1970). We hold that request number 12 was improper under the Rules then in effect and does not require an admission that the union's actions with respect to Roadway were a strike. While such an admission, if made, would really make no difference in this case, since the Roadway strike is not an issue, the analysis brings us to a consideration of one of the two important requests in the group which we have not deemed admitted, request number 20, which calls for an admission that:

"Local 107's action in the instant case constituted a strike against the MTLR member companies, which continued through and including June 26, 1965."

While the union's answer was again somewhat evasive and was couched in terms of the union's legal theories of defense, we view this as we viewed request number 12, not binding the union to an admission that it was engaged in a strike which continued through and including June 26, 1965.

■■■ The last request to be considered is request number 8, which read:

"(8) As of June 20, 1965, no list of representatives having authority to call or institute strikes or stoppages of work had been submitted by Local Union 107."

The defendant answered:

"(8) Defendant does not admit this fact. The Defendant has not been able to find anything in writing to indicate that such a list was submitted. Neither has the Defendant been able to find any record to indicate that such a list was not submitted. As a result, Defendant cannot at this time admit this fact."

Old Rule 36 states that the request for admission will be deemed admitted unless the answering party serves on the requesting party "either (1) a sworn statement denying specifically the mat-

ters of which an admission is requested or setting forth in detail the reasons why he cannot truthfully admit or deny those matters. . . . " In Dulansky et al. v. Iowa-Illinois Gas & Electric Co., 92 F.Supp. 118, 124 (S.D.Iowa 1950) the court stated that if the word "denied" is qualified by a statement that the answering party does not possess the necessary information to form a belief about the truth of the matter, such a response would be deemed admitted. But the union in the present case did not use the word "denied." Moreover, "a refusal to admit does not amount to a denial." Southern Ry. Co. v. Crosby, 201 F.2d 878, 880 (4th Cir. 1953). We feel on a fair reading of the union's answer should not be characterized as a denial but rather as an answer in which it sets forth "in detail the reasons why [it] cannot truthfully admit or deny those matters." Fed. R.Civ.P. 36(a).

However, the characterization of the answer as such does not end the discussion because of a judicially-imposed limitation. "The more usual view, however, was that a party was required to admit or deny, even though he lacked any personal knowledge, if the means of information were reasonably within his power. This majority view, which was supported by all the commentators, has now been written into the rule." 8 Wright and Miller, Federal Practice and Procedure § 2261, at 730–31 (1970). *Accord,* Advisory Committee Note of 1970 to Amended Rule 36. In other words, in order to reply that it cannot "truthfully admit or deny" the request, the union must demonstrate that it has taken reasonable measures to discover the truth or falsity of the requested fact. Under both the old and new Rule 36, it is not clear whether the answering party must specify what measures were taken in order to answer the request truthfully. Under the amended Rule 36, it would appear that a mere statement in the answer that the answering party has made reasonable inquiry and that the information solicited was insufficient to enable

him to admit or deny the requested matter will suffice.[7]

The fairest method would seem to be to allow the answering party to merely state that he has made reasonable inquiry. Then, the requesting party may challenge the answer as insufficient because the answering party's inquiry was not a reasonable one in light of the particular circumstances. However, we are not confronted with the mere statement of the union that it conducted a reasonable inquiry and that it gleaned no affirmative knowledge from that investigation which would enable it to admit or deny request number 8; on the contrary, it is apparent from the answer that the union had attempted to procure the information necessary to admit or deny. Whether the inquiry was reasonable, thus making the answer sufficient, should not rest on the technical wording of the answer. Based upon the argument of counsel, we infer reasonableness of the inquiry. Therefore, we find that the union's answer to request number 8 is adequate and it shall not be deemed admitted.

Judge Higginbotham has reviewed this Opinion and Order and authorizes me to state that he concurs with the Opinion and Order.

In accordance with the foregoing, we enter the following order.

### ORDER

It is ordered that:

1. Defendant's motion for extension of time in which to answer requests for admissions is hereby denied;

2. Defendant's reply to plaintiffs' statement of facts filed March 25, 1970, is treated as a response to the requests for admissions; upon examination of the requests and responses, all of the requests are deemed admitted with the exception of requests numbered 8, 12, 20, 37 and 39, which are deemed controverted;

3. Plaintiffs are granted leave to file within twenty days a new motion for summary judgment on the basis of the newly admitted facts.

---

7. Rule 36, as amended July 1, 1970, states in part:

"An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless he *states* that he has made reasonable inquiry and that the information known or readily obtainable by him is insufficient to enable him to admit or deny." (emphasis added).