**YORK DIVISION, BORG–WARNER CORPORATION, Plaintiff,**

v.

**UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBERS AND PIPE FITTING INDUSTRY et al., Defendants.**

**No. 78–1812–Civ–JLK.**

United States District Court,
S. D. Florida

March 23, 1979.

---

Seyfarth, Shaw, Fairweather & Geraldson, Miami, Fla., for plaintiff.

Allan Elster, North Miami Beach, Fla., James R. O'Connell, Washington, D.C., Lloyd Marks, Miami, Fla., for defendants.

### ORDER GRANTING PARTIAL SUMMARY JUDGMENT

JAMES LAWRENCE KING, District Judge.

The plaintiff-employer, York Division, Borg-Warner Corporation (York), brought this action under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, against the United Association

of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry (United Association) and Local Union 725, which is affiliated with the United Association. York seeks an injunction prohibiting an allegedly wrongful work stoppage and damages which resulted from the work stoppage. Presently pending before this Court are motions for summary judgment on liability filed by York against both defendants, and a cross motion for summary judgment filed by the United Association against York.

## I. FACTUAL BACKGROUND

The undisputed facts are as follows. York is a corporation which is engaged in the service and maintenance of air-conditioning and refrigeration equipment. At its Miami Branch, York employs approximately 17 employees who are members of the defendant unions. These employees are bound by a Collective Bargaining Agreement dated August 16, 1977, which was signed by the United Association and the plaintiff's analogous association, the Mechanical Contractors Association of America, Inc. Article XVI of this agreement contains the following no-strike clause:

> Neither the Union nor any of the employees covered by this Agreement will collectively, concertedly or individually induce, engage or participate, directly or indirectly, in any strike, picketing slowdown, stoppage or other curtailment or interference with the Employer's operations . . . . The Union agrees to exert every effort through its International and local officers and representatives to end any unauthorized interruption of work.

This lawsuit involves an alleged breach of the above provision by both the local union and the United Association. The liability of Local 725 is predicated upon certain actions taken by its officers; the liability of the United Association is predicated upon its alleged vicarious liability for the actions of Local 725 under the theory of agency, and upon certain direct actions taken by its own officers.

Before discussing the particular events which prompted this lawsuit, it is helpful to examine the structure of the unions. This examination is crucial to the determination of agency, and is presented first so that the particular actions of the local union members, for which York seeks to hold the United Association vicariously liable, can be viewed in terms of this structure. The nature of the inter-union structure can be gleaned through an examination of the Constitution and By-laws of the United Association, and the affidavit of Martin J. Ward, the General President of the United Association. Turning first to the control of the United Association over the local unions, the court notes that the powers of the United Association in this respect can be divided into three general categories. The first category involves the establishment of a local union. The United Association alone is vested with the power to establish local unions. Title to the charter and books of a local union is held by the United Association, and cannot pass from that Association. The next category involves control over certain 'management' functions. The Constitution establishes certain controls for members' dues books, which are issued by the General Secretary-Treasurer through the "agency" of the local union. Local unions are required to send per capita amounts of dues to the United Association every month, and must collect and forward entire amounts of special assessments to the United Association. The Constitution of the United Association also sets forth a description of the local officer positions, together with certain eligibility requirements and procedures for election of officers for these positions. It also sets forth the procedures for the removal of local officers. The final 'management' power involves strikes. If a local union goes on strike, it must supply a weekly strike report to the General Secretary-Treasurer. Members who engage in an unauthorized strike, or one in violation of a collective bargaining agreement are subject to discipline by the United Association. The last category of powers involves the 'termination' power. The General President of the United Association has the

authority to suspend a local union, place it under trusteeship, or revoke its charter. If the charter is revoked, then all local property, assets and books of the local union revert to the United Association.

Against this background of the United Association's general powers, the court now turns to an examination of the independent powers of the local union to control its own affairs. Each local union has its own by-laws, and passes upon the qualifications of persons seeking membership. It fixes its own initiation fees and dues from its members. It elects its own officers, transacts its own business, and may negotiate its own collective bargaining agreements. All funds of the local union are deposited in the name of the local union and are controlled exclusively by the local union. The appropriate local officer is required to account for all funds and may make disbursements only upon the order of · the local union. Each local union files a separate report, as an unincorporated association, under the Labor Management Reporting and Disclosure Act of 1959. Thus, the local union has control over its specific day-to-day operations, subject to certain constraints imposed by the broad guidelines established by the United Association.

The particular chain of events which led to the present dispute began on Thursday, April 27, 1978, when the business agent of Local 725, John Brown, was advised that York intended to terminate its employment of the union steward at the close of business on Friday, April 28, 1978. As a result of this action by York, Brown notified all union employees of York that he was "pulling the shop," and that they should not report to work on Monday, May 1, 1978. The undisputed evidence indicates that this action was taken pursuant to a local agreement executed by Local 725 and the Air Conditioning, Refrigeration, Heating and Piping Association, Inc., which allegedly superseded the no-strike provision of the national Collective Bargaining Agreement, and authorized such work stoppages. However, the undisputed evidence also reveals that York was not a party to this local agreement.

No union members reported for work at York on that Monday morning, and at 9:30 a. m., York sent a telegram to the United Association advising it of the unauthorized work stoppage and requesting the union to exert every effort to end this strike, as required under the Collective Bargaining Agreement. Mr. Alfred A. Sciadini, the Director of Organization for the United Association, testified at deposition that he first learned of this work stoppage when he received the telegram on the morning of May 1st. In response, he sent a telegram to the business manager of Local 725, instructing him to advise all York employees to report back to work immediately.

All employees remained out on strike on Tuesday, May 2nd. On that evening, after the regular monthly meeting of Local 725, Brown and another local union official, La-Valley, spoke to each York employee individually. At this time each employee was shown the telegram from the United Association, was advised that the strike was illegal, and was told to return to work or face the possible consequences of a fine, suspension or expulsion from the union. The evidence is conflicting as to whether, in addition to the above advice, the employees were also told that they would be acting contrary to the union's best interests if they returned to work, and thus were implicitly encouraged to maintain the work stoppage. The materiality of this factual dispute will be discussed later.

On May 3rd, all employees continued to remain away from work, and York filed this action. Also on May 3rd, according to the testimony of Mr. Sciadini, the United Association sent individual telegrams to all York ·employees advising them to report back to work. There appears to be some dispute over whether every employee actually received such a telegram.

This court issued a temporary restraining order on May 5, 1978, and prohibited any further work stoppage. On May 10th, some employees still refused to return to work, and this court entered an order to show cause why those employees should not be

held in contempt of court. On the same day, Mr. Sciadini traveled from Washington, D.C. to Miami to discover why the work stoppage had not ended and to expedite the return to work. He personally advised all members of the local union to honor the Agreement and return to work. Mr. Sciadini also testified that he has been involved in other incidences of alleged work stoppages by local unions governed by the national Collective Bargaining Agreement, and that all such work stoppages were settled within a few days of their inception, as a result of his telegrams and telephone calls advising the local unions to get their membership back to work.

On May 11th, all employees who had not returned to work resigned from York's employ, and the work stoppage finally ceased. The court now turns to the legal significance of the above facts.

## II. THE LIABILITY OF LOCAL 725

York contends that the undisputed facts establish that Local 725 instigated a strike in violation of the Collective Bargaining Agreement, and that therefore Local 725 is liable as a matter of law for the damages caused to York for the duration of the work stoppage. York has therefore moved for partial summary judgment against Local 725 on the issue of liability.

Local 725 opposes this motion on two grounds. First, it contends that it is not bound by the terms of the Collective Bargaining Agreement because the no-strike provision was superseded by the local agreement between Local 725 and the Air Conditioning, Refrigeration, Heating and Pipefitting Association, Inc. Local 725 also contends that even if it "misconceived the application of the 'Local Agreement' in instigating a walk-out of the Plaintiff's employees on May 1st, . . . [it] had cured its error" and absolved itself of further liability on the evening of May 2nd when it commenced every reasonable effort to end the strike.

■ The court can dispose of the first contention of Local 725 in a summary fashion. Since York was not a party to the local agreement, this agreement could not supersede the national agreement as to York, and therefore the terms of the local agreement cannot provide Local 725 with a defense to this lawsuit.

■ The second contention of Local 725 merits closer attention. The local union admits that if the local agreement is inapplicable, then it is liable for damages caused by the work stoppage on May 1st and May 2nd. Thus, the court concludes that partial summary judgment should be entered in favor of York on the issue of the liability of Local 725 for the breach of the Collective Bargaining Agreement which occurred when the business agent of Local 725 "pulled the shop." A more difficult question is presented by the issue of liability for damages which occurred as a result of the work stoppage after May 2nd. After carefully reviewing the record, the court concludes that summary judgment is not appropriate on this issue. If the trier of fact concludes that the continued work stoppage was not the result of the initial breach and that Local 725 exerted every effort to end the strike after May 2nd, then the local union may escape liability for the continued wrongful activity of some of its members. However, if the trier of fact finds that the continued work stoppage was the result of the initial breach, or that the union did not exert every effort to end the work stoppage, then Local 725 will be liable for the damages caused to York. *Adley Express Co. v. Highway Truck Drivers and Helpers, Local No. 107*, 349 F.Supp. 436 (E.D.Pa. 1972). These are matters which must be resolved at trial, and as to them, summary judgment is denied.

## III. LIABILITY OF THE INTERNATIONAL UNION

### A. Vicarious Liability

York claims that the United Association is liable vicariously for the wrongful activities of Local 725 in instigating the work stoppage because the local union functions merely as an agent of the United Association. York further contends that it is entitled to summary judgment against the

United Association because the undisputed facts establish the existence of this agency relationship as a matter of law. The United Association has filed a cross-motion for summary judgment on the grounds that the undisputed facts establish that there is no agency relationship.

The issue presented here is not novel. The United States District Court for the Western District of Texas was faced with the same issue in *F. A. Villalba & Co. v. United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry,* 413 F.Supp. 94 (W.D.Tex. 1976). In that case the court held that the local union was not an agent of the United Association. Although *Villalba* is not a binding precedent to which this court must adhere, it is highly persuasive, and this court agrees with the rationale of that opinion:

> In order to establish an agency relationship between the Defendant United Association and the Defendant Local Union, the Plaintiff would as proof be required to demonstrate that the constitution of the United Association provides for all-pervasive control of the Local Union. After careful consideration of the United Association's constitution and the affidavits offered in support of the motion for summary judgment, this Court is persuaded that, as a matter of law, for purposes of the present action, no agency relationship exists between the Defendants . . . . [U]nder the United Association's constitution every affiliated local union . . . operates and functions as an autonomous body, separate and distinct from the United Association. Each local union . . . elects and compensates its own officers, transacts its own business, negotiates its own collective bargaining agreements, and . . freely governs itself and transacts its own business on its own behalf through its own agents and representatives. Each local has its own bylaws, passes upon the qualifications of persons seeking membership therein, fixes its own initiation fees and dues for members, engages in its own collective bargaining through its own agents . . . . [E]ach local

union has control of its own financial affairs, elects and is governed by its own officers, and hires its own employees, all without approval of the United Association.

> In weighing the indicia of union control of the Local against the indicia of local autonomy, this Court is convinced that . . . the latter are determinative as a matter of law.

The above reasoning applies with full force to this case since the same United Association is involved in both cases, although the local affiliates are different. Therefore, this court concludes that the United Association cannot be held liable for the action of Local 725, and summary judgment on this issue is granted in favor of the United Association. This conclusion does not absolve the United Association from all liability, however, because York also alleges that the United Association is liable due to its own failure to exert every effort to end the work stoppage. It is to this question of direct liability that the court now turns.

B. Direct Liability

Under the Collective Bargaining Agreement, the United Association is under a duty "to exert every effort . . . to end any unauthorized interruption of work." The United Association contends that the undisputed material facts are insufficient as a matter of law to establish that it breached this duty, and that it is entitled to summary judgment on this issue. York contends, in opposition, that there is a factual dispute concerning the sufficiency of the efforts employed by the United Association to end the work stoppage. The court agrees with York, and concludes that summary judgment must be denied.

Based upon the foregoing discussion the court does

ORDER AND ADJUDGE that partial summary judgment is entered in favor of the plaintiff, York Division, Borg-Warner Corporation, on the issue of the liability of the defendant, Local 725, for damages caused by the work stoppage on May 1, 1978, and May 2, 1978. It is further

ORDERED AND ADJUDGED that partial summary judgment is denied as to the

liability of the defendant, Local 725, for damages resulting from the work stoppage which occurred after May 2, 1978. It is further

ORDERED AND ADJUDGED that partial summary judgment is granted in favor of the defendant, United Association of Journeymen and Apprentices of the Plumbers and Pipe Fitting Industry, on the issue of its vicarious liability for the actions of Local 725. Local 725 is not an agent of the United Association for the purpose of establishing liability for damages resulting from the work stoppage. It is further

ORDERED AND ADJUDGED that the motion for summary judgment is denied as to the issue of the liability of the United Association of Journeymen and Apprentices of the Plumbers and Pipe Fitting Industry for failure to exert every effort to end the work stoppage, as required under the Collective Bargaining Agreement.

DONE AND ORDERED in chambers in Miami, Florida, this 23 day of March, 1979.